Approved: _____
KIERSTEN A. FLETCHER
Assistant United States Attorney

**21 MAG 4261**

Before:   THE HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :   **SEALED COMPLAINT**
                                  :
UNITED STATES OF AMERICA          :   Violations of
                                  :   15 U.S.C. §§ 78j(b) and
          - v. -                  :   78ff; 17 C.F.R. § 240.10b-
                                  :   5; 18 U.S.C. §§ 1343 and 2.
ANDREW FRANZONE,                  :
                                  :   COUNTY OF OFFENSES:
               Defendant.         :   New York
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

EDWARD F. GANNON, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service and charges as follows:

### COUNT ONE
### (Securities Fraud)

1.  From at least in or about 2014, up to and including in or about September 2019, in the Southern District of New York and elsewhere, ANDREW FRANZONE, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, FRANZONE fraudulently induced victims to purchase limited partnership interests in an investment fund by means of misrepresentations and omissions,

and continued that pattern of fraudulent misrepresentations and omissions throughout the life of the fund.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

2.   From at least in or about 2014, up to and including in or about September 2019, in the Southern District of New York and elsewhere, ANDREW FRANZONE, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, FRANZONE, using electronic transfers of funds, email communications, interstate telephone calls, and other wire communications, fraudulently induced his victims to purchase limited partnership interests in an investment fund by means of misrepresentations and omissions, and continued that pattern of fraudulent misrepresentations and omissions throughout the life of the fund.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.   I have been a Postal Inspector with United States Postal Inspection Service ("USPIS") for approximately 14 years. I am currently assigned to an USPIS group focused on investigating complex white-collar crimes, including securities fraud, commodities fraud, wire fraud, and other financial crimes.  As part of my work with USPIS, I have received training regarding ways in which these crimes are perpetrated, have participated in numerous investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

4.   Since in or about December 2020, I have been investigating ANDREW FRANZONE, the defendant, and his fraudulent activities in connection with his role as founder and General

Partner of FF Fund I L.P. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during the course of this investigation, directly or indirectly, from other sources, including: (a) conversations with, and reports prepared by, other law enforcement agents; (b) information and documents obtained from non-law enforcement witnesses, including FF Fund investors and individuals currently involved in the liquidation of FF Fund; (c) documents and information obtained from banks and other financial institutions; (d) publicly available information; including public filings in FF Fund's bankruptcy proceedings and other litigation; and (e) documents and information collected by the United States Securities and Exchange Commission (the "SEC") in connection with a parallel SEC investigation of FRANZONE. Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

5. Based on my participation in this investigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a. ANDREW FRANZONE, the defendant, is a 44-year old citizen of the United States.

    b. In or about 2010, FRANZONE and another individual ("Individual-1") began soliciting investments in a newly formed hedge fund, Farrell Franzone Investments LLC ("Farrell Franzone"). FRANZONE described Farrell Franzone as an opportunity for investors to invest, through the purchase of limited partnership ("LP") interests, in a hedge fund purporting to trade preferred securities and options and to maintain a highly liquid portfolio for its investors. From 2010 until late 2014, Farrell Franzone maintained an office in Manhattan, New York.

    c. In or about late 2014, Individual-1 left Farrell Franzone and FRANZONE renamed the fund FF Fund I ("FF Fund"). FRANZONE also moved to Florida and began operating FF Fund out of the Miami, Florida area. FRANZONE assured existing and prospective investors that FF Fund would continue to employ the

3

same investment strategy employed at Farrell Franzone, including that FF Fund would maintain a highly liquid portfolio and that this liquidity would ensure that investors could redeem their LP interests on a quarterly basis.

        d.    Between in or about late 2014 and FF Fund's bankruptcy in or about September 2019, FRANZONE served as FF Fund's General Partner responsible for managing FF Fund's investments, which he touted to prospective investors as a "multi-strategy investment program … focus[ed] on three unique asset classes: the preferred stock market, the option market, and the private investment portfolio." When discussing FF Fund, FRANZONE represented that FF Fund was focused on trading in the preferred securities and options markets, and that FF Fund had a track record of consistent positive trading returns since its inception in August 2010.

        e.    Throughout the life of FF Fund, FRANZONE also continued to maintain, among other things, that FF Fund was highly liquid, that the trading strategy continued to focus on preferred securities and options, and that private investments accounted for no more than 20% of FF Fund's investments. FRANZONE further maintained that FF Fund's proprietary trading strategy was achieving consistent, positive returns, as reflected in monthly performance reports FRANZONE sent to investors.

        f.    By in or about late 2018, FRANZONE represented to investors and prospective investors in FF Fund that FF Fund had reached $70 million in assets under management.

        g.    In fact, and as further set forth below, these representations by FRANZONE, were largely false. Contrary to his claims that FF Fund was engaged primarily in preferred securities and options trading that ensured the FF Fund's liquidity, and that investors could redeem their LP interests on a quarterly basis, by in or about 2018 FRANZONE had in fact diverted more than 80% of FF Fund's assets to high-risk, illiquid private investments, many of which were either worthless or significantly impaired, and had misappropriated fund assets to fund his own personal business interests. Furthermore, FRANZONE's representation that FF Fund had $70 million in assets under management by in or about late 2018 was false, as FF Fund in fact never had more than $40 million in assets under management. Finally, FRANZONE's representations to investors about the positive performance of FF Fund, including

4

the monthly performance reports provided to investors, were largely fabricated.

  h. Through these and other fraudulent misrepresentations and omissions, described further below, FRANZONE induced over 100 investors to invest more than $40 million in FF Fund.  Despite showing investors positive trading returns as late as in or about early 2019, FF Fund could not satisfy redemption requests and is currently in the process of being liquidated.

<u>FF Fund's Purported Trading Strategy</u>

 6. Based on my participation in this investigation, and my review of marketing materials and email communications provided or caused to be provided by ANDREW FRANZONE, the defendant, to investors and prospective investors in FF Fund, as well as the sources listed in paragraph 4 *supra*, I have learned that FRANZONE touted FF Fund's trading strategy and its focus on preferred securities and options, including by describing that strategy in detail and providing investors and prospective investors with detailed information on the returns generated through the trading strategy, including, in substance and in part, the following:

  a. The Private Placement Memorandum ("PPM") governing FF Fund described the "core of the Partnership's multi-strategy investment program" to be a "focus on three unique asset classes: the preferred stock market, the option market, and the private portfolio."  The PPM further explained that through FF Fund's  "proprietary pricing models and the Principal's 14 years of trading and investing experience," FF Fund would "seek to exploit short, medium, and long-term valuation and volatility inefficiencies across the universe of exchange-traded preferred stock and option securities, and seek capital appreciation and income in the private portfolio."

  b. FF Fund's website further touted its "Trading Philosophy," which included, among other things:

   i. A multi-paragraph discussion describing FF Fund's "focus on the option and preferred markets" and the ability of trading in those markets to achieve a "balanced and predictable quarterly income stream";

   ii. A detailed summary of the "fundamentals and trading characteristics" to be considered by FF Fund in trading

5

preferred securities and options, including "capital structure," "coupon size," "liquidity and trade execution," "directional short positions," and "current income trading strategies"; and

   iii. A single paragraph on FF Fund's use of "Private/Non-Exchange Traded Investments," representing that FF Fund would devote "a portion of its capital … to attempt to minimize the portfolio's overall volatility and exposure to exchange traded market risk."

  c. In conversations with investors and prospective investors, FRANZONE repeatedly represented that FF Fund was engaged in securities trading and that FF Fund's returns represented trading returns.  For example, in a February 25, 2016 email to a Manhattan-based FF Fund investor ("Investor-1"), FRANZONE told Investor-1 that "February 2015 has also been tracking nicely as well on the trading front and the monthly return in February 2016 is currently still posting a gain with just 3 trading days to go in the month."

  d. On or about July 25, 2016, FRANZONE emailed a prospective investor and told the investor, in substance and in part, that:

   i. FF Fund was a "multi-strategy fixed income hedge fund, and it typically appeals to people who are looking for an annual income stream from preferred stocks, bonds, or other high-yielding, asset-backed public or private investments."

   ii. FF Fund was "continuing to track along nicely here on the trading front to start out 2016 with a year-to-date 2016 gain of about 3.5% net of all fees and expenses through the end of June 2016."

   iii. FRANZONE "update[d] the fund's track record once every week throughout the middle of each month so that all of the fund's investors can follow along with the trading returns in real-time in between the official monthly investor statements"; and

   iv. FF Fund's "lowest return over any rolling 12-month consecutive period has been a gain of 5.21% net of all fees and expenses, and the highest return over any rolling 12-month consecutive period has been a gain of 24.03% net of all fees and expenses."

6

   e. On or about August 21, 2018, FRANZONE emailed another prospective investor, copying a Manhattan-based wealth manager ("Wealth Manager-1"), and repeated the same claims about FF Fund's trading strategy and returns, including by, among other things:

    i. Providing a document purporting to reflect FF Fund's rolling 12-month returns, which showed FF Fund had positive trading returns ranging from 5% to more than 18% every month from August 2010 through August 2018.

    ii. Representing that FF Fund had approximately $70 million in assets under management, and that "the strategy is … roughly 60% income securities, mostly with strategies to add income and kickers over dividends; 10% equity, mostly income producing with dividends and options; 10% alternatives; 10% real estate; and 10% private investments."

   f. On or about May 30, 2017, FRANZONE emailed another prospective investor, and represented that he was "just trading on the screens throughout all of the days" and could therefore speak to the prospective investor any time that week or the following week.

<u>FRANZONE Defrauds Investors in FF Fund</u>

 7. Based on my participation in this investigation, including my interviews of investors in FF Fund, my review of materials provided by investors in FF Fund, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

   a. In or about 2012, ANDREW FRANZONE, the defendant was introduced to Investor-1 by Wealth Manager-1, Investor-1's family member who then worked in wealth management at a large investment firm.

   b. In addition to Investor-1's management of Investor-1's personal investments, Investor-1 also acted as Trustee of a family trust unrelated to Investor-1's family (the "Trust"), and made investment decisions on behalf of the Trust. During the relevant time period, certain of the Trust's investments were managed by Wealth Manager-1.  In or about 2012, Investor-1 invested approximately $1.1 million of Investor-1's personal retirement funds in FF Fund.

7

      c.    Investor-1 invested in FF Fund based on FRANZONE's representation that FF Fund traded in preferred securities and options and was highly liquid.  Investor-1 was aware that FF Fund might devote a small portion of FF Fund assets to private investments, but Investor-1 would not have invested in FF Fund if Investor-1 understood that FF Fund intended to pursue an illiquid private investment strategy.

      d.    In the months that followed Investor-1's personal investment in FF Fund, Investor-1 received monthly performance reports by email, which showed Investor-1 that FF Fund was earning positive trading returns every month.

      e.    On several occasions between in or about 2012 and 2014, FRANZONE solicited Wealth Manager-1 and Investor-1 to recruit additional investors to FF Fund, including the Trust, during meetings that took place at FRANZONE's office, as well as Wealth Manager-1's office, both of which were located in Manhattan, New York.  During these and subsequent conversations, FRANZONE claimed that FF Fund's strategy primarily focused on trading in preferred securities and options, and that FF Fund would invest no more than 20% of FF Fund's portfolio in illiquid private investments through F5, which Wealth Manager-1 understood to be a wholly owned-subsidiary of FF Fund.

      f.    In or about July 2014, the Trust invested approximately $4 million in FF Fund.

      g.    In or about late 2014, Wealth Manager-1 learned that Individual-1 was no longer partnered with FRANZONE and that FRANZONE had moved from New York to Florida.  In response to Wealth Manager-1's questions about whether FF Fund's trading strategy would change as a result of Indvivdiual-1's departure or FRANZONE's move to Florida, FRANZONE assured Wealth Manager-1 that FRANZONE would continue to execute the same liquid trading strategy going forward.

      h.    Based upon FRANZONE's representations to Investor-1 and Wealth Manager-1 that FF Fund was actively trading in preferred securities and options, and that FF Fund had achieved consistent, positive returns on that trading since August 2010, Investor-1, on behalf of the Trust, invested an additional $23.5 million with FF Fund between in or about December 2014 and 2017.

      i.    In addition, based on the above representations, as well as FRANZONE's representation that Wealth Manager-1's

clients could obtain quarterly liquidity, that is, redeem their investments on three months' notice, Wealth Manager-1 recommended that several of his other clients invest with FF Fund.

   j. In making investment recommendations, it was critical to Wealth Manager-1 that Wealth Manager-1's clients did not represent a majority of FF Fund's invested capital. In or about August 2018, FRANZONE represented to Wealth Manager-1 that FF Fund had approximately $70 million in assets under management, which Wealth Manager-1 understood to be approximately double the combined capital invested by Wealth Manager-1's clients.

   k. In truth and in fact, as set forth below, beginning in or about 2015, FF Fund no longer engaged in any meaningful securities or options trading, was illiquid, never had more than $40 million in assets under management, and the purported rolling 12-month trading returns were largely fabricated by FRANZONE.

  8. Based on my participation in this investigation, my review of deposition testimony from a second FF Fund investor ("Investor-2"), as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

   a. Investor-2 first met ANDREW FRANZONE, the defendant, in or about 2012. Beginning in or about 2014, Investor-2 and her husband ("Investor-3") developed a close personal friendship with FRANZONE arising from, among other things, their shared interest in race car driving.

   b. In or about 2015, FRANZONE and Investor-3 (who is a former professional race car driver), agreed to start a racing team (the "Racing Team"). FRANZONE represented to Investor-2 and Investor-3 that he earned approximately $1.2 million per year in management fees from FF Fund, in addition to performance fees, and FRANZONE could afford to fund the Racing Team's operations if Investor-3 agreed to act as the Racing Team's manager.

   c. FRANZONE represented to Investor-2 and Investor-3 that he was skilled in trading securities and that FF Fund was earning steady returns. Based upon these representations, in or about January 2016, Investor-2 and Investor-3 invested approximately $150,000 in FF Fund. As noted above, by this date, FF Fund no longer engaged in any meaningful securities or

9

options trading, was illiquid, and FRANZONE was fabricating the returns he was providing to investors.

   d. Investor-2 understood from conversations with FRANZONE that FF Fund was liquid, and that Investor-2 could withdraw the funds Investor-2 had with FF Fund upon demand.

   e. On one occasion in or about 2016, Investor-2 requested $75,000 from Investor-2's account at FF Fund, and FRANZONE promptly sent Investor-2 the funds.

   f. Based upon FRANZONE's representations related to FF Fund's returns and liquidity, Investor-2 and Investor-3 made multiple additional investments in FF Fund between in or about 2017 and 2019 totaling approximately $350,000.

<u>FRANZONE Diverts FF Fund Assets to His Personal Business Interests</u>

  9. Based on my participation in this investigation, my review of Investor-2's deposition testimony, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

   a. In or about 2014, Investor-2 and Investor-3 discussed with FRANZONE the possibility of purchasing an airplane hangar in Florida to store the Racing Team's cars (the "Airplane Hangar").  In or about 2014, Investor-2 and Investor-3 paid the owner of the Airplane Hangar a $50,000 deposit and promised to complete the purchase of the Airplane Hangar the following year.

   b. In or about October 2015, FRANZONE told Investor-2 and Investor-3 that he wanted to own the Airplane Hangar personally.  FRANZONE subsequently provided Investor-2 and Investor-3 approximately $565,000 in funds FRANZONE represented to be his personal funds to purchase the Airplane Hangar and reimburse Investor-2 and Investor-3 for the deposit on the Airplane Hangar.

   c. From in or about 2015 through 2019, the title for the Airplane Hanger was in the name of an entity owned by Investor-3, notwithstanding that FRANZONE had purchased it.  Investor-2 and Investor-3 told FRANZONE that the Airplane Hangar should be in FRANZONE's name, since it belonged to FRANZONE.  FRANZONE refused to change the title for the Airplane Hangar, and told Investor-2 that the Airplane Hangar would be

10

Investor-2's "insurance plan" should anything happen to FRANZONE.

       d.   FRANZONE paid the taxes and expenses on the Airplane Hangar until in or about 2019.

10. Based on my participation in this investigation, my review of materials provided by FF Fund's fund administrator (the "Fund Administrator"), my review of materials provided by Investor-2 and Investor-3, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

       a.   In or about early October 2015, a bank account held in the name of Farrell Franzone LP (the "8543 Account") received wire transfers from an FF Fund investor as well as from another bank account in the name of Farrell Franzone LP.

       b.   On or about October 2, 2015, the 8543 Account transferred $100,000 to a second account in the name of Farrell Franzone Investments LLC (the "1941 Account").

       c.   On or about October 2, 2015, the 1941 Account transferred $100,000 to an account controlled by Investor-3 (the "Investor-3 Account").

       d.   On or about October 6, 2015, the 8543 Account transferred $465,000 to the 1941 Account.

       e.   On or about October 6, 2015, the 1941 Account transferred $465,000 to the Investor-3 Account.

       f.   The Investor-3 Account funded the purchase of the Airplane Hangar shortly thereafter.

       g.   Based on these bank records, I have learned that contrary to FRANZONE's claim that he was purchasing the Airplane Hangar with his personal funds, FRANZONE in fact used FF Fund assets to purchase the Airplane Hangar for his personal business.

### FRANZONE's Fraud is Uncovered

11. Based on my participation in this investigation, my review of materials provided by the Fund Administrator, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

a. In or about April 2019, Wealth Manager-1 became suspicious of ANDREW FRANZONE, the defendant, and demanded that FRANZONE meet with Wealth Manager-1 to discuss FF Fund. Wealth Manager-1 told FRANZONE to bring his laptop to the meeting and to be prepared to discuss FF Fund's investments.

b. On or about April 30, 2019, FRANZONE and Wealth Manager-1 met in person in Wealth Manager-1's office in Manhattan (the "April 30, 2019 Meeting"). During the April 30, 2019 Meeting, among other things:

i. FRANZONE admitted that FF Fund had not engaged in public securities trading since January 2018.

ii. FRANZONE admitted that FF Fund's portfolio was comprised entirely of illiquid investments in private companies held by F5.

iii. FRANZONE admitted that FF Fund had little to no cash, and that FRANZONE had recently had to borrow $200,000 to fund FF Fund's redemption requests.

iv. FRANZONE provided Wealth Manager-1 a list of FF Fund's assets (the "April 2019 Asset List"), which included many private, illiquid investments, as well as their purported valuations.

v. Wealth Manager-1 told FRANZONE that several of the assets on the April 2019 Asset List were inflated in value, including an investment marked by FRANZONE at $500,000 and which was in fact worthless, because the company had filed for bankruptcy. FRANZONE did not dispute that the April 2019 Asset List contained inflated valuations of FF Fund's assets.

vi. Wealth Manager-1 demanded that FRANZONE provide Wealth Manager-1 with access to FF Fund's books and records. FRANZONE initially agreed, but ultimately refused to do so.

c. Following the April 30, 2019 Meeting, Wealth Manager-1 and Investor-1 sought audited financial statements from FRANZONE, to which FRANZONE responded that he did not have audited financial statements for FF Fund for the years 2015 through 2018, and audited financials would not be available until June 30, 2019.

      d.    Beginning in or about June 2019, several of Wealth Manager-1's clients, including the Trust, sent FF Fund redemption requests. FF Fund did not fulfill the redemption requests and instead filed for bankruptcy protection.

      e.    Based upon my conversations with Wealth Manager-1, I have learned that Wealth Manager-1 would not have recommended his clients invest in FF Fund had he known that his clients' investments constituted the vast majority of the invested capital in FF Fund.

12. Based on my participation in this investigation, my review of Investor-2's deposition testimony and a sworn affidavit submitted by Investor-2 in a related litigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

      a.    Investor-2 and Investor-3 had several conversations with ANDREW FRANZONE, the defendant, in the weeks that followed the April 30, 2019 Meeting.

      b.    During one such conversation, FRANZONE admitted to Investor-2 and Investor-3 that FF Fund had not engaged in securities trading for the prior two years.

      c.    During another conversation, FRANZONE admitted that he had used FF Fund's assets to purchase the Airplane Hangar, contrary to his prior statements that the Airplane Hangar was purchased with FRANZONE's personal funds.

      d.    In or about May 2019, FRANZONE asked Investor-2 and Investor-3 to sign backdated documents confirming their awareness in 2015 that FF Fund had purchased the Airplane Hangar and the Airplane Hangar was an FF Fund asset. Investor-2 and Investor-3 refused to do so.

### The Lack of Trading in FF Fund Since January 2015

13. Based on my participation in this investigation, my review of materials provided by the Fund Administrator, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

      a.    In or about January 2014, FF Fund assets maintained at securities brokerage firms accounted for at least approximately 74% of FF Fund's portfolio. Less than 1% of FF Fund's portfolio was allocated to private investments.

13

b. In or about 2014, securities trading on behalf of FF Fund was primarily booked in one of FF Fund's wholly-owned subsidiaries, F1 General Trading Partners ("F1"). After January 1, 2015, no securities trades were executed on behalf of F1.

c. By the end of in or about 2017, FF Fund assets maintained at securities brokerage firms accounted for only approximately 5% of FF Fund's portfolio, and approximately 80% of FF Fund's portfolio was diverted to private, illiquid investments.

d. FF Fund engaged in minimal, sporadic securities trading in other FF Fund subsidiaries after in or about 2015. Records from the Fund Administrator show that FF Fund's post-2015 trading returns were either negative or flat.

e. In or about August 2018, FF Fund had approximately $36 million in invested capital.

f. Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund's securities trading after 2015 was small in volume and did not generate anywhere close to the returns FRANZONE represented.

g. Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund's portfolio was completely illiquid at least as of 2018, and investors could not achieve the promised quarterly liquidity on their FF Fund investments, nor could they redeem their investments.

h. Contrary to FRANZONE's representations to investors and prospective investors, *see* paragraphs 6 through 8 *supra*, FF Fund did not have $70 million in assets under management as of in or about August 2018 and instead had only approximately half that, the vast majority of which came from Wealth Manager-1's clients.

### FRANZONE Misappropriated FF Fund Assets

14. Based on my participation in this investigation, including my review of filings in the bankruptcy proceeding involving FF Fund, I have learned, among other things, the following:

      a. In or about September 2019, FF Fund filed for bankruptcy and is currently in the process of being liquidated.

      b. In the course of FF Fund's liquidation, the court-appointed chief restructuring officer ("CRO") has endeavored to locate and value FF Fund's assets.

      c. During the CRO's investigation, the CRO determined that F5, that is, the entity that held more than 80% of FF Fund's assets as of 2018, was not in fact a wholly-owned subsidiary of FF Fund. Instead, based on the CRO's investigation, I have learned that F5 was, at all relevant times, owned and controlled by ANDREW FRANZONE, the defendant, individually.

WHEREFORE, I respectfully request that an arrest warrant be issued for ANDREW FRANZONE, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

/s/ Edward F. Gannon with permission JLC
_____
EDWARD F. GANNON
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
20th day of April 2021

_____
JAMES L. COTT
United States Magistrate Judge