UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                        :

UNITED STATES OF AMERICA,        :
                                          :

                  v.                :

                                          :          21-CR-446 (VSB)

ANDREW FRANZONE,                 :
                                          :          **OPINION & ORDER**

                       Defendant.  :

                                          :
---------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

      Defendant Andrew Franzone is charged with one count of securities fraud and one count of wire fraud in an indictment filed July 8, 2021. (Doc. 4 ("Indictment").) Before me are (1) Franzone's motion to suppress evidence stemming from two separate seizures that occurred in spring 2021, (Doc. 32 ("Def. Mem. 1")); and (2) Franzone's motion to suppress materials seized from his Gmail account, (Docs. 81 ("Def. Mot. 2"), 84 ("Def. Mem. 2")). For the reasons explained below, Franzone's motions are DENIED.

## I.    **Factual Background**[1]

      Franzone was the founder and General Partner of an investment fund called Farrell Franzone Investments LLC, renamed FF Fund I ("FF Fund") in 2014. (Indictment ¶¶ 1–2.) Franzone represented to investors that the fund was invested in highly liquid preferred securities and options and that the fund was achieving consistent, positive returns. (*Id.* ¶ 4.) The Indictment alleges that, in reality, the fund was engaged in mostly high-risk, illiquid private investments. (*Id.* ¶ 6.) Allegedly, Franzone's misrepresentations and omissions fraudulently

---

[1] This section provides a high-level overview of the facts. Specific facts that are better understood in the context of the parties' arguments about them are presented in Section IV, *infra*.

induced over $40 million in investments in FF Fund from over 100 investors. (*Id.* ¶ 7.) On September 24, 2019, FF Fund filed for Chapter 11 bankruptcy. (*See* Doc. 83, Ex. D.)

On April 20, 2021, Magistrate Judge James L. Cott signed a criminal complaint charging Franzone with securities fraud and wire fraud and issued an arrest warrant. (Doc. 1 ("Compl.").) On April 22, 2021, law enforcement agents from the United States Postal Inspection Service ("USPIS") arrested Franzone in Fort Lauderdale, Florida. (Def. Mem. 1 at 7.) At that time, Franzone had been living in room 1147 of the Westin Beach Resort & Spa in Fort Lauderdale for about a year. (*Id.* at 6.) On April 28, 2021, FF Fund filed a notice of intent to liquidate the company. (*See* Doc. 83, Ex. G.)

### A.  *Warrantless Seizure at W Hotel*

On the afternoon of his arrest, Franzone was at an outdoor bar at the W Hotel, down the block from the Westin.[2] (Def. Mem. 1 at 6.) He had brought his laptop and cell phone with him, and was using his devices to work and make phone calls. (*Id.*) Franzone had a habit of pacing around the outdoor bar area of the W, sometimes sitting apart from his belongings for a period of time, although he made a point of keeping an eye on them. (*Id.* at 6–7.)

USPIS agents approached Franzone and arrested him. According to Franzone, he was sitting "some yards away" from where he had left his cell phone and laptop when he was arrested. (*Id.* at 7.) According to Postal Inspector Gannon, who participated in Franzone's arrest, Franzone was sitting "with his laptop on his lap" when USPIS approached. (Doc. 56

---

[2] There is a debate in the motion papers about whether Franzone was arrested at the Westin Hotel, where he was staying, or the W Hotel, which is down the block. Franzone argues that Postal Inspector Edward F. Gannon materially misrepresents where the arrest occurred when he stated it was at the Westin, undermining the veracity of various affidavits he submitted. (*See* Def. Mem. 1 at 33.) At oral argument on the first motion to suppress, the Government conceded that Franzone's arrest took place at the W Hotel and stated that this was a good-faith mistake by the arresting agents, who believed they were on premises of the Westin. (*See* Transcript of Sept. 12, 2022 Oral Argument ("Oral Arg. 1 Tr.") at 22:9–13.) As the hotels are down the block from each other and the agents moved from the premises of the Westin to the W on foot, I find that this was a reasonable error, not an attempt to mislead.

("Gannon Decl.") ¶ 6.)  When Gannon stated that Franzone was under arrest, Franzone "put his laptop down on the bench next to him" near his cell phone.  (*Id.* ¶ 7.)

### B. *First Warrant*

Both parties agree that Franzone's stay at the Westin was terminated on April 22, 2021, the same day as his arrest.  The Government states that Franzone was "due to leave on April 22, 2021 due to nonpayment," (Doc. 37 ("Gov. Opp'n 1") at 17), citing to Franzone's April 22, 2021 invoice from the Westin, which states "NoACCESS" next to Franzone's name and displays an outstanding balance of $2270.68, (Def. Mem. 1, Ex. C).  Franzone states that he "was not scheduled to check out of the Westin the day of [his] arrest, whether for non-payment or otherwise," explaining that he had an arrangement with the Westin in which his bills could accumulate and periodically he would be asked to pay the balance by the hotel.  (Doc. 32, Ex. D ("Franzone Aff.") ¶ 3.)  Franzone further asserts that had he not been arrested, he would have continued to reside at the Westin.  (*Id.* ¶ 4.)

Franzone's mother, Margaret McGuirk, submitted an affidavit stating that throughout Franzone's yearlong residence at the Westin, she periodically made calls to the Westin to pay his hotel bill, and she made one such call on April 24, 2021.  (Def. Mem. 1, Ex. A ("McGuirk Aff.") ¶¶ 2–4.)  McGuirk paid Franzone's outstanding balance, and when she learned that he had been checked out of the hotel, she requested the return of his belongings.  (*Id.* ¶ 4.)  She was told that such a request would be handled by a different hotel employee named Alain, whom she was able to speak to a few days later.  (*Id.* ¶¶ 5–6.)  Alain informed McGuirk that Franzone's electronic devices "had been picked up by a man named Ed Gannon, and that the rest of [Franzone's] belongings had been placed in two black garbage bags, which were in the Hotel's business center."  (*Id.* ¶ 6.)

On April 28, 2021, Inspector Gannon spoke to the Director of Security for the Fort Lauderdale Westin. (Gannon Decl. ¶ 8.) The Director of Security informed Gannon that he had entered Franzone's former hotel room the prior day to collect Franzone's possessions at the request of a member of his family. (*Id.*) The Director of Security reported to Gannon that he had observed a laptop and "what appeared to be piles of financial documents." (*Id.*) Gannon represents that at the end of this conversation with the Director of Security, he was under the impression that Franzone's belongings remained in his former hotel room. (*Id.*)

On April 30, 2021, USPIS obtained a warrant in the Southern District of Florida which authorized the search of Room 1174 in the Fort Lauderdale Westin Hotel and the seizure of any evidence, fruits, and instrumentalities of securities and wire fraud stemming from Franzone's FF Fund scheme. (Def. Mem. 1, Ex. I ("First Warrant").) The application for the First Warrant was supported by an affidavit from Gannon. (Def. Mem. 1, Ex. H.)

On May 1, 2021, Gannon served the Director of Security with the First Warrant. (Gannon Decl. ¶ 10.) The Director of Security then informed Gannon that Franzone's possessions had been removed from his former hotel room and were secured in another area of the Westin. (*Id.*) The Director of Security nonetheless told Gannon that he would provide Franzone's possessions to USPIS based upon the First Warrant. (*Id.*) On May 3, 2021, a different postal inspector based in Florida went to the Westin to collect evidence from among Franzone's possessions, instructed by Gannon to collect only items related to the investigation, such as computers, financial records, and credit cards, and to leave behind personal items, such as clothes and toiletries. (*Id.* ¶ 11.) The items seized from the Westin Hotel included "financial documents, documents related to the Fund Liquidation, credit cards, and [four] electronic

devices." (Def. Mem. 1, Ex. J ¶ 14.) The collected items were shipped to Gannon, who received them on May 11, 2021. (Gov. Opp'n 1 at 5.)

### C. *Second Warrant*

On May 21, 2021, the Government obtained a warrant in the Southern District of New York to search the laptop and cell phone seized from the W Hotel on the day of Franzone's arrest, as well as the laptop, cell phone, and two hard drives seized from the Westin Hotel pursuant to the First Warrant. (Def. Mem. 1, Ex. K ("Second Warrant").) The Government's warrant application was supported by an affidavit from Gannon. (Def. Mem. 1, Ex. J.) The Second Warrant authorized law enforcement personnel to review electronically stored information contained on the six subject devices that was created or modified between January 1, 2012 and the execution of the warrant for evidence, fruits, and instrumentalities of securities and wire fraud relating to the alleged FF Fund scheme. (*See* Second Warrant.)

### D. *Third Warrant*

On December 9, 2022, the Government obtained a warrant in the Southern District of New York to search Franzone's Gmail account for evidence, fruits, and instrumentalities of Franzone's alleged crimes. (*See* Doc. 83, Ex. C ("Third Warrant").) The warrant was directed to Google, and asked Google to provide information for Franzone's account from January 1, 2016 to April 22, 2021, including email content, Google services data, subscriber and payment information, Chrome browser and search history records, device information, information regarding linked accounts, transactional records, customer correspondence, and preserved or backup records. (Third Warrant §§ I–II.) The application for the Third Warrant was supported by an affidavit from Postal Inspector Christopher O'Rourke, who participated in the investigation of Franzone. (*See* Doc. 83, Ex. B ("O'Rourke Aff.").) O'Rourke's affidavit

incorporated the Complaint in Franzone's case by reference and attached it as an exhibit. (*Id.* ¶ 8, Ex. A.)

## II.    **Procedural History**

On June 24, 2022, Franzone moved to suppress all evidence obtained from the devices seized on the day of his arrest, as well as the property seized from the Westin Hotel. (Doc. 32.) The Government filed its opposition on July 29, 2022, (Doc. 37), and Franzone filed his amended reply on August 8, 2022, (Doc. 39). I held oral argument on the issues presented by Franzone's motion to suppress on September 12, 2022.[3]

On May 25, 2023, Franzone moved to suppress the materials seized from his Gmail account pursuant to the Third Warrant. (Doc. 81.) On August 16, 2023, the Government opposed Franzone's motion. (Doc. 89.) Franzone filed his reply on September 6, 2023. (Doc. 90.) I held oral argument on the suppression issues related to the Gmail search and seizure on September 26, 2023.[4]

## III.    **Legal Standard**

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (internal quotation marks omitted). The reasonableness standard generally requires that law enforcement conduct searches and seizures pursuant to a warrant supported by probable cause. *See id.* at 382. Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found in the

---

[3] Franzone's first motion to suppress was argued by Joseph Corozzo of Rubinstein & Corozzo, LLP.

[4] Franzone's second motion to suppress was argued by Deborah Colson of Moskowitz Colson Ginsberg & Schulman. Ms. Colson withdrew as counsel in this case on January 30, 2024. (Doc. 114.)

place to be searched." *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014) (summary order) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382 (citation omitted).

IV.    **Discussion**

A. ***Cell Phone and Laptop Taken at W Hotel***

Franzone challenges the seizure of his laptop and cell phone at the W Hotel on the day of his arrest. It is undisputed that this seizure was not pursuant to a warrant. If a "seizure [was] conducted without a warrant, the burden is on the government to establish that the . . . seizure fits within one of the exceptions to the warrant requirement." *United States v. Haskins*, No. 21-CR-269, 2022 WL 1460277, at *7 (E.D.N.Y. May 9, 2022) (citing *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993)). The two relevant exceptions here are (1) the search-incident-to-arrest exception, and (2) the plain view exception.

The Government contends that devices were seized incident to Franzone's arrest. (Gov. Opp'n 1 at 4.) The Government also argues that the seizure of the devices at the W Hotel can be sustained under the plain view exception to the warrant requirement. (*Id.* at 10.) Franzone contends that the seizure of the two devices was not incident to arrest, nor did it fit within any other exception to the warrant requirement. (Def. Mem. 1 at 14–16.)

1. **Search Incident to Arrest**

An arresting officer may search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). This limitation "ensures that the scope of a search incident to arrest is commensurate with its purposes

of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant*, 556 U.S. 332, 339 (2009). In other words, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.*

The parties' versions of the events on April 22, 2021 differ. Franzone states that at the time of his arrest, he was sitting "some yards away" from where he had left his cell phone and laptop. (Franzone Aff. ¶ 13.) Franzone goes on to state that four federal agents came over and arrested him, and "[a]fter [he] was in custody," one of the agents seized his laptop and cell phone. (*Id.* ¶¶ 14, 17.) At the September 12, 2022 oral argument on the suppression motion, counsel for Franzone indicated that "[i]f Mr. Franzone were to testify," he would say that the devices were "more than nine feet away" from him at the time of his arrest. (Oral Arg. 1 Tr. at 20:12–14.)

Postal Inspector Gannon stated that when he approached Franzone, Franzone was sitting on a bench with one of his legs kicked up and his laptop on his lap. (Gannon Decl. ¶ 6.) Upon seeing Gannon and another postal inspector, Franzone put his laptop down on the bench next to him, where his phone was as well. (*Id.* ¶ 7.) Gannon states that "[a]nother Postal Inspector who participated in the arrest collected the laptop and the cellphone from the bench following the arrest." (*Id.*)

Putting aside the dispute about whether the devices were right beside Franzone or nine feet away, the parties agree on the critical fact that the devices were seized after Franzone was arrested. Once Franzone had been taken into custody, there was no risk that he could reach into the area containing his devices and conceal or destroy evidence of his crimes. Hence, the

justification for the search-incident-to-arrest exception is absent and the exception does not apply.

### 2. Plain View

The Government next argues that the seizure of the devices at the W Hotel was permissible under the plain view exception to the warrant requirement. (Gov. Opp'n 1 at 10.) Under the plain view doctrine, if (1) law enforcement officers "are lawfully in a position from which they view an object;" (2) to which they "have a lawful right of access;" and (3) it is "immediately apparent" that there is probable cause to believe that the item constitutes evidence of a crime, the officers may seize the item without a warrant. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *see also Arizona v. Hicks*, 480 U.S. 321, 326 (1987).

The parties do not dispute that the postal inspectors were lawfully on premises at the W Hotel and able to access Franzone's devices, satisfying the first two prongs of the plain view exception. The question is whether the incriminating nature of Franzone's devices was immediately apparent. The Government points out that the postal inspectors who arrested Franzone had all the knowledge of the investigation that would be subsequently set forth in support of the First Warrant to search the devices, which was deemed by a magistrate judge sufficient to establish probable cause. (Gov. Opp'n 1 at 10.) Franzone asserts that it was not immediately apparent that the devices belonged to him. (Def. Mem. 1 at 17.) Even if it was clear the devices were his, Franzone argues, investigators had no reason to connect the two devices at the W Hotel to text messages sent years earlier of which investigators were aware. (*Id.* at 16–17.)

First, I find that it was reasonable for the postal inspectors to assume that the devices belonged to Franzone. The parties agree that there were other guests present in the outdoor area

of the W Hotel, but it was not crowded.  (*See* Franzone Aff. ¶ 12; Gannon Decl. ¶ 7.)  Inspector

Gannon states that "Franzone was the only person sitting in the area, and there were several

tables between Franzone and the next closest person."  (Gannon Decl. ¶ 7.)  Franzone states that

he had been using his devices for about three to four hours while "moving between the W's

outdoor tables and seating areas," before going to sit some yards away to clear his head.

(Franzone Aff. ¶¶ 12–13.)  Franzone's ability to move between different tables and seating areas

underscores that the W Hotel patio was not crowded.  Although Franzone disagrees about the

distance he was from his electronics, Franzone's affidavit does not contradict Postal Inspector

Gannon's assertion that he was the closest person to the devices, and Franzone concedes that he

would typically "make an effort to keep the devices within [his] line of sight," (*id.* ¶ 10).

Without resolving the dispute regarding the precise proximity of the devices, the arresting postal

inspectors had probable cause to believe that the devices belonged to Franzone when the

surrounding area was not crowded, and he was the closest person to the devices.

       Second, I find that it was immediately apparent to the arresting postal inspectors that

there was probable cause to believe that the laptop and cell phone contained evidence of

Franzone's alleged wire fraud and securities fraud.  USPIS, including Inspector Gannon, had

been investigating Franzone since at least December 2020.  (Compl. at 2–3.)  The heart of the

wire fraud count was that Franzone had used "electronic transfers of funds, email

communications, interstate telephone calls, and other wire communications" to "fraudulently

induce[] his victims to purchase limited partnership interests in an investment fund by means of

misrepresentations and omissions."  (*Id.* at 2.)  It stands to reason that evidence of these emails,

phone calls, money transfers, and other communications would be present on the devices that

Franzone carried with him.

10

Indeed, soon after the seizure of these devices, two separate magistrate judges found that there was probable cause to believe that Franzone's various electronic devices contained evidence of his alleged crimes.  The Government represents in their briefing that the postal inspectors who seized the devices "had all the knowledge of the investigation and the case that they would [later] set forth" in the warrant applications.[5]  (Gov. Opp'n 1 at 10.)  On May 14, 2021, Magistrate Judge Lurana S. Snow in the Southern District of Florida issued a warrant authorizing the seizure of "any computer devices, cellphones, and storage media" in Franzone's hotel room, (First Warrant at 1.B.), based on an affidavit from Inspector Gannon stating:

> Based on my training and experience, I know that individuals who engage in conspiracies to commit wire fraud and securities fraud, commonly use computers, cellphones, and other electronic devices to access websites used for illegal activity; communicate with co-conspirators and victims online;  keep track of co-conspirators' and victims' contact information;  keep a record of illegal transactions or criminal proceeds for future reference; store data regarding victims and potential victims for future exploitation. . . . Based upon my participation in this investigation and my review of email communications involving FRANZONE . . . I know that FRANZONE used email to communicate with investors in FF Fund to perpetrate the Subject Offenses.  . . . I also know that, where computers, cellphones, and other electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.

(Doc. 32, Ex. H ¶¶ 12–14.)  On May 21, 2021, a Magistrate Judge in the Southern District of New York found that there was probable cause to search six of Franzone's devices, including the cell phone and laptop seized at the W Hotel, (Doc. 32, Ex. K), based on an affidavit from Postal Inspector Gannon that contained very similar assertions establishing probable cause, (Doc, 32, Ex. J).  Even if I did not credit the Government's representation that at the moment of the

---

[5] I note that an unspecified Postal Inspector, not Inspector Gannon, seized the devices, but I can consider the knowledge of the law enforcement team as a whole under the collective knowledge doctrine.  *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

seizure, the Postal Inspectors had all the information later set forth in Inspector Gannon's affidavits, the issuance of the two warrants affirms the clear connection between the charged crimes and Franzone's electronic devices.  I therefore find that the seizure of Franzone's laptop and cell phone from the W Hotel on the day of his arrest was justified by the plain view exception to the warrant requirement.

### 3.  Unreasonable Delay

Franzone argues that even if his cell phone and laptop were validly seized pursuant to the plain view exception to the warrant requirement, the lengthy delay between the warrantless seizure and law enforcement's application for a warrant to search his devices was unreasonable. (Def. Mem. 1 at 18–22.)  Under the Fourth Amendment's reasonableness standard, when law enforcement agents seize a suspect's personal property pending the issuance of a search warrant, they must act with diligence to apply for the desired search warrant.  *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020).  To assess whether law enforcement has unreasonably delayed applying for a search warrant, courts look to:  "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay."  *Id.* at 206. (citation omitted).

The first factor, the length of the delay, weighs strongly in favor of the Defendant. Franzone's cell phone and laptop were seized on April 22, 2021, and agents did not apply for a warrant to search the devices until May 21, 2021 – a delay of 29 calendar days, or 21 business days.[6]  The Second Circuit has found that "a month-long delay well exceeds what is ordinarily

---

[6] Courts have measured delay both in calendar days and business days.  I will primarily refer to the delay here in calendar days because that is the majority approach in *Smith*.  *Compare Smith*, 967 F.3d at 212 (majority opinion) (finding that "31-day delay" was unreasonable), *with id.* at 216 (Kearse, J., concurring) ("[A]lthough there was a

reasonable." *Id.* at 207; *see also United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (finding 11-day delay reasonable due to reduced possessory interest and intervening holidays but noting that "[i]n some circumstances eleven days might well constitute an unreasonable delay"). The 29-day delay here clearly exceeds what is reasonable.

Turning to the second factor, both parties agree that the cell phone and laptop were important to Franzone. (*See* Franzone Aff. ¶ 15; Def. Mem. 1 at 20; Gov. Opp'n 1 at 12.) Indeed, a person's cell phone and laptop are "typically used for communication and for the storage of immense amounts of personal data," much of which is likely "deeply personal." *Smith*, 967 F.3d at 207 (discussing the seizure of a personal tablet computer); *see also Riley*, 573 U.S. at 393–98 (holding that searches of personal electronic devices implicate greater privacy interests than searches of ordinary physical objects due to immense quantity, variety, and complexity of data contained on personal electronic devices).

The Government notes that Franzone did not request his devices back until eight months after his arrest. (Gov. Opp'n 1 at 13.) Although Franzone eventually made a formal request for the return of his devices, (Franzone Aff. ¶ 23), the delay in seeking the devices' return weighs against Franzone in evaluating the importance of the devices. *Cf. Smith*, 967 F.3d at 208 (noting that Defendant "did not request the return of the [seized] tablet" in affirming that 'importance of seized property to defendant' factor weighs in the Government's favor). Franzone's detention, which lasted for the entirety of the delay period, further reduces the value of the devices, since he would not be permitted to use them while detained. *See In re Application for Search Warrant*, 527 F. Supp. 3d 179, 185 (D. Conn. 2020) (finding that importance factor weighed in favor of

---

span of 31 calendar days from the seizure of the tablet to the application for the search warrant, I regard the appropriate frame of reference as the 19 working days within that span.").

the issuance of a search warrant where defendant was detained and "would be unable to make use of the devices, even if they had not been seized"). Balancing the importance of the devices against Franzone's delay in requesting their return and his inability to utilize the devices while detained, the second factor weighs in the Government's favor.

The third factor addresses whether the defendant had a reduced property interest in the seized items. There is no dispute that Franzone did not consent to the seizure of his devices. Nor did he relinquish control of his devices by turning them over to a third party, as the defendant did in *Martin*, 157 F.3d at 54, when he gave a package to the United Parcel Service that was subsequently seized by law enforcement. There was, however, probable cause to seize the devices, which reduces Franzone's possessory interest. *See Smith*, 967 F.3d at, 209 ("[A]ll else being equal, the Fourth Amendment will tolerate greater delays after probable-cause seizures [than reasonable-suspicion seizures]." (quoting *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012))). In *Smith*, the Second Circuit held that, even with the existence of probable cause, this factor was neutral or slightly in favor of defendant where law enforcement did not charge defendant with the crime at issue, possession of child pornography, until after the seized device was searched and incriminating images discovered. Here, in contrast, the officers here had already investigated Franzone for criminal activity involving the use of electronic devices to disseminate misleading information, and obtained an arrest warrant for that activity prior to the seizure and search of the devices. (*See* Compl. ¶ 2 ("Franzone, using electronic transfers of funds, email communications, interstate telephone calls, and other wire communications, fraudulently induced his victims . . ."); *see also id.* ¶¶ 6(c), 6(d), 6(e), 6(f) (providing examples of Franzone's email communications furthering the fraud scheme).) The probable cause was therefore stronger here than in *Smith*. *See United States v. Wells*, No. 20-

14

CR-633, 2023 WL 2223474, at *5 (S.D.N.Y. Feb. 23, 2023) (finding that the property interest factor weighed in favor of the government where three phones were seized but defendant "had been the subject of an ongoing investigation into criminal activity that involved [defendant] exchanging text messages and phone calls in furtherance of that illegal conduct"). I find that this factor weighs in favor of the Government.

The fourth factor, the state's justification for the delay, weighs strongly in favor of Franzone. The Government states that USPIS continued to investigate and gather evidence of Franzone's crimes after the seizure, including by obtaining and executing the First Warrant, and that the devices needed to be transported from Florida to New York to obtain a warrant in this district. (Gov. Opp'n 1 at 13–14.) Neither of these justifications can bear the weight of a month-long delay. First, although the Government notes that investigators obtained the First Warrant during the delay period, the Government provides no other information about the specific investigative activity occurring that it argues should justify the delay. In contrast, courts have found delay justified where the government was working to obtain approval of the draft search warrant from another department at the Department of Justice due to an internal policy, *United States v. Watson*, No. 23-CR-82, 2023 WL 7300618, at *10 (E.D.N.Y. Nov. 6, 2023), or where law enforcement agents testified about their work "interviewing several witnesses, serving grand jury subpoenas, and obtaining other warrants related to co-defendants" during the delay period, *United States v. Payne*, No. 19-CR-170, 2021 WL 9978612, at *15 (W.D.N.Y. Dec. 29, 2021), *report and recommendation adopted sub nom. United States v. Hay*, No. 19-CR-170, 2023 WL 142119 (W.D.N.Y. Jan. 10, 2023). In any event, continued investigation after the seizure is immaterial to the delay question without any suggestion that the continued investigation caused the delay. *See United States v. Eisenberg*, 707 F. Supp. 3d 406, 415 (S.D.N.Y. 2023) (finding

that the justification factor weighed in defendant's favor when "there was no testimony showing that the indictment," which was put together during the delay period, "was the cause of the delay"). The Government does not say, for example, that continued investigation was necessary to supply the evidence to include in the search warrant application, or that continued investigation prevented applying for the warrant due to limited law enforcement resources. *See United States v. Daskal*, 676 F. Supp. 3d 153, 169 (E.D.N.Y. 2023) ("[D]istrict courts in this Circuit have only . . . found [the] justification [of continued investigation] to be compelling when new evidence comes to light between the confiscation of property and issuance of a warrant."); *Smith*, 967 F.3d at 211 (noting that "delay may be excused 'if some overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case,'" or "the resources of law enforcement are simply overwhelmed by the nature of a particular investigation" (quoting *United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009))). Second, transporting a laptop and a cell phone from Florida to New York and applying to get a search warrant does not take a month, and therefore does not justify a month-long delay.

The first factor, the length of the delay, and the fourth factor, the justification for the delay, weigh strongly in favor of Franzone. The second factor, the importance of the seized property, and the third factor, the possessory interest in the seized property, weigh in the Government's favor. Although this is a close call, the first and fourth factors weigh more strongly in Franzone's favor than the second and third factors do in the Government's favor, so I find that the balance of these factors weighs slightly in favor of Franzone. The 29-day delay in seeking a search warrant for Franzone's cell phone and laptop was therefore unreasonable under the Fourth Amendment.

### 4. Exclusionary Rule

The Government contends that even if the delay in seeking a search warrant were unreasonable, I should not suppress the devices, including the information gleaned from them pursuant to the Second Warrant. (Gov. Opp'n 1 at 14.) When law enforcement violates the Fourth Amendment, courts can apply the exclusionary rule to suppress ill-gotten evidence. However, "[n]ot every violation of the Fourth Amendment justifies invocation of the exclusionary rule." *Smith*, 967 F.3d at 211. The goal of the exclusionary rule is to deter misconduct, and therefore it is directed at instances where law enforcement violates a suspect's Fourth Amendment rights "deliberately, recklessly, or with gross negligence . . . [or] recurring or systemic negligence." *Davis v. United States*, 564 U.S. 229, 240 (2011) (citation omitted). In contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," the exclusionary rule does not apply. *Id.* at 238 (internal quotation marks omitted).

The Government argues that there is no evidence that the arresting officers acted with deliberate intent to violate Franzone's rights, citing *Smith* for the proposition that suppression of Franzone's cell phone and laptop would serve no appreciable deterrent value here. (Gov. Opp'n 1 at 14.) The *Smith* court did not apply the exclusionary rule because "precedent ran both ways" as to the reasonableness of delay at that time and it was not clear that a reasonably well-trained officer would have known that a month-long delay violated the defendant's Fourth Amendment rights. 967 F.3d at 212–13. That is no longer the case. The facts of this delay, however, present a closer case than *Smith*, with two factors of the unreasonable delay test weighing in favor of the defendant and two in favor of the Government. Given that this is a close case and there is no evidence of bad faith, I find that law enforcement did not act with intent to violate Franzone's

rights deliberately, recklessly, or with gross negligence.  In addition, there is no evidence that there was recurring or systemic negligence.  This was more likely a good-faith mistake or a case of simple, isolated negligence.[7]  Franzone's motion to suppress the cell phone and laptop seized at the W Hotel on the day of his arrest is hereby DENIED.

### B. *Property Seized from Westin Hotel*

The Government obtained the First Warrant to seize Franzone's property from his Westin hotel room, but by the time agents sought to execute the warrant, Franzone's possessions had been moved to a different location in the hotel.  The Government contends that Franzone has no standing to challenge the seizure that subsequently took place, and that the possessions were handed over on the consent of the Westin, not pursuant to the First Warrant.  (*See* Gov. Opp'n 1 at 14–22.)  Franzone disagrees, arguing that the seizure was overbroad and the warrant was insufficiently particular and unsupported by probable cause.  (*See* Def. Mem. 1 at 23–32.)

### 1. Standing to Challenge Seizure

In Fourth Amendment case law, the concept of standing is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 584 U.S. 395, 410 (2018).  There are two ways to make this showing.  One option is to show that a person has a subjective expectation of privacy in the area searched, and that society is prepared to recognize such an expectation as reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  The other way is to show physical intrusion by the Government upon a person's property interest protected by the Fourth Amendment, i.e. "persons, houses,

---

[7] I note that if law enforcement continues to engage in month-long, unjustified delays, suppression may be warranted in the future.

papers, and effects," with the intent to gain information. *See United States v. Jones*, 565 U.S. 400, 406 (2012); *see also Florida v. Jardines*, 569 U.S. 1, 7–10 (2013) (stating that there was no implied license to enter the area surrounding a home with a trained police dog because the conduct of law enforcement "objectively reveals a purpose to conduct a search" ).

Franzone has standing to challenge the seizure that took place at the Westin Hotel. The Government searched his possessions, including his business records and personal electronic devices. These items constitute Franzone's "papers" and "effects" under the Fourth Amendment. *See, e.g.*, *Skinner v. Chapman*, 326 F. Supp. 2d 431, 433 (W.D.N.Y. 2004) ("'Effects' are defined to include personal property under Fourth Amendment analysis." (citing *United States v. Place*, 462 U.S. 696, 705 (1983)). Franzone's arrest separated him from his possessions, but he did not abandon his effects or relinquish his property interest. To the contrary, Franzone's mother, acting on his behalf, paid the remaining balance on his hotel bill and repeatedly requested the return of his possessions from the hotel. (*See* McGuirk Aff. ¶¶ 4–8.) Government agents physically seized some of Franzone's possessions, interfering with his possessory interest in them and preventing the return of those possessions to his mother's home. The goal of this seizure was to obtain information to assist law enforcement in their ongoing investigation of Franzone. Hence, Franzone can show a physical intrusion by the Government on his papers and effects with the intent to gain information, constituting a search and seizure under *Jones* and conferring standing under the Fourth Amendment. I need not reach the question of whether this also constituted a search and seizure under *Katz*.

### 2. Consent

The Government argues that the evidence obtained from the Westin Hotel was voluntarily given to law enforcement by Westin personnel, and therefore not obtained pursuant

to the First Warrant.  (Gov. Opp'n 1 at 17.)  Putting aside the question of whether Westin personnel had the authority to consent to the seizure of Franzone's belongings, the record belies the Government's claim as a factual matter.  Postal Inspector Gannon states that he served the Westin Director of Security with the First Warrant, and "[u]pon receipt of the Hotel Room Warrant, the Director of Security told [Gannon] that . . . [the Westin] would provide the Franzone Evidence to USPIS based upon the Hotel Room Warrant."  (Gannon Decl. ¶ 10.)  It is axiomatic that "a search [cannot] be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant."  *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).  Given that the Westin Director of Security explicitly stated that the hotel would turn over Franzone's belongings based on law enforcement presenting them with the First Warrant, there can be no question that the Government's seizure of Franzone's belongings at the Westin was for all practical purposes pursuant to the First Warrant.

### 3.  Warrant

#### a.  Overbreadth

Franzone claims that law enforcement indiscriminately seized all of his possessions from the Westin, including items like clothes and toiletries that are not authorized by the First Warrant, thus unreasonably exceeding the scope of the First Warrant.  (*See* Def. Mem. 1 at 24–26.)  A search that exceeds the scope authorized by a validly issued warrant, absent an exception to the warrant requirement, is unconstitutional.  *Horton v. California*, 496 U.S. 128, 140 (1990).

The record does not support Franzone's claim.  In support of his argument, Franzone cites to his own affidavit, which states that he "learned later that the rest of [his] belongings (including but not limited to [his] clothes, four other electronic devices, etc.), had been placed

into bags and . . . seized by the U.S. Postal Inspection Service." (Franzone Aff. ¶ 18.) Franzone

was detained during these events, so he cannot be making these assertions based on personal

knowledge, nor does he state from whom he learned this information. Therefore, I give this

claim no weight. *See Goodall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 725 F. Supp. 3d

248, 264 (N.D.N.Y. 2024) ("[A] court may simply disregard portions of an affidavit or

affirmation that are not based on personal knowledge." (internal quotation marks omitted)).

Franzone also cites to his mother Margaret McGuirk's affidavit, which states that a Westin

employee told her that Franzone's "electronic devices had been picked up by a man named Ed

Gannon, and that the rest of [Franzone's] belongings had been placed in two black garbage bags,

which were in the Hotel's business center." (McGuirk Aff. ¶ 6.) This directly undermines

Franzone's argument that the Government seized his clothes and other personal possessions, and

instead supports the Government's claim that law enforcement did not indiscriminately take all

of Franzone's possessions, and in fact left some of his possessions with the hotel. Finally,

Franzone cites to Gannon's affidavit in support of the Second Warrant application, which states

that Gannon was told that Franzone's belongings had been removed from his hotel room and

would be provided to law enforcement. (Doc. 32, Ex. J ¶ 14.) Gannon goes on to say that

Franzone's belongings were shipped to him, and "contain[ed] financial documents, documents

related to the Fund Liquidation, credit cards, and several electronic devices," (*id.*), all of which

are within the scope of the First Warrant, (*see* First Warrant). Although the phrasing of

Gannon's declaration is perhaps not as precise as it could have been, I read the list of items

"contain[ed]" in Franzone's seized belongings to be a complete list, and it does not include

clothing or toiletries. At oral argument on this motion, the Government supported this reading of

Gannon's declaration by providing an inventory of items seized from the Westin, which did not

include any clothing or toiletries, and representing that there was no bag of clothes seized.  (*See* Oral Arg. 1 Tr. 10:20–24; *see also* Doc. 167, Ex. A (listing inventory of items seized from the Fort Lauderdale Westin on April 22, 2021, including credit cards, documents, and electronic devices but no clothing or toiletries).)  The evidence does not support a finding that the seizure of items from the Westin exceeded the scope of the authorizing warrant.

b.  <u>Probable Cause</u>

Franzone argues that the First Warrant was not supported by probable cause because it was based on a tip from an individual identified in the warrant application only as "Hotel Employee-1."  (Def. Mem. 1 at 28.)  Franzone states that this "may have been an anonymous tip" and indicates that it likely required more corroboration.  (*Id.* at 28–30.)

Probable cause for a search warrant requires "a fair probability that contraband or evidence of a crime will be found in the place to be searched."  *Rissew*, 580 F. App'x at 36 (citing *Gates*, 462 U.S. at 238).  When reviewing a warrant for the presence of probable cause, the duty of district courts is "simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed."  *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238–39) (alterations adopted).  A magistrate judge's finding of probable cause "is entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant."  *Id.* (internal quotation marks omitted).

The application for the First Warrant was sufficient to support a finding of probable cause.  Gannon's affidavit states that he spoke with "a representative of the Hotel" who told him that he went into Franzone's room to collect his belongings at the request of a family member, and while inside observed a laptop and "what appeared to be piles of financial documents." (Doc. 32, Ex. H ¶ 10.)  Gannon also attested to the likelihood that Franzone used computers, cell

22

phones, and other electronic devices in furtherance of the alleged securities and wire fraud scheme based on his general experience investigating financial crimes, as well as his specific knowledge of the Franzone investigation.  (*Id.* ¶¶ 12–16.)  Gannon's knowledge that he was speaking with a representative of the Westin dispels the suggestion that this could have been an anonymous tip.  Furthermore, it is common practice for the Government not to disclose the names of witnesses in a search warrant.  *See In re Four Search Warrants*, 945 F. Supp. 1563, 1570 (N.D. Ga. 1996) ("When the Government files its applications for search warrants, it has an absolute right . . . [and] prosecutorial prerogative [to] not include[] [witness] names."); *cf. United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990) ("[Federal Rule of Criminal Procedure] 16 does not require the Government to furnish the names and addresses of its witnesses in general."); *United States v. Triana-Mateus*, No. 98-CR-958, 2002 WL 562649, at *6 (S.D.N.Y. Apr. 15, 2002) ("[T]here is no general right to [pretrial] disclosure . . . of the identity of government witnesses." (citing *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975))). The eyewitness account from a hotel employee provides good reason to believe electronic devices and financial documents were indeed in Franzone's hotel room.  Gannon's experience and knowledge of the investigation indicates that the devices and documents are likely to contain pertinent evidence of Franzone's alleged crimes.  Altogether, the application for the First Warrant demonstrated a fair probability that evidence of Franzone's crimes would be found in his former hotel room.

c.  Particularity

Franzone next asserts that the First Warrant improperly designated the place to be searched.  (*See* Def. Mem. 1 at 26–27.)  The Fourth Amendment states that warrants must "particularly describe[e] the place to be searched."  U.S. Const. amend. IV.  A sufficiently

particular description is one in which "the officer with a search warrant can, with reasonable

effort ascertain and identify the place intended." *United States v. Voustianiouk*, 685 F.3d 206,

211 (2d Cir. 2012) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)). "[W]hen officers

search a location other than the one that the magistrate judge intended to be searched . . . there is

no need to inquire into whether the warrant's description was sufficiently particular to satisfy the

Fourth Amendment in order to determine if the search violated the Constitution, because the

search was conducted without the authorization of a warrant." *Id.* at 212.

The First Warrant designates the place to be searched as hotel room 1174 on the eleventh

floor of the Fort Lauderdale Westin Hotel. (*See* First Warrant.) It is undisputed that the

designated location was never searched. Westin personnel removed Franzone's belongings from

his hotel room (which was actually room 1147), secured them in another part of the hotel, and

the Government obtained them from this other part of the hotel. (*See* Franzone Aff. ¶ 2;

McGuirk Aff. ¶ 6; Gannon Decl. ¶ 10.)

This is analogous to the situation addressed by the Second Circuit in *Voustianiouk*, where

officers obtained a warrant to search a first-floor apartment, but upon arrival, realized their

suspect lived in the second-floor apartment. Instead of calling a magistrate judge and obtaining a

new, accurate warrant, the officers simply went to the second-floor apartment and searched it.

The Second Circuit held that this search was warrantless and unconstitutional because "the

Fourth Amendment does not permit the police to search one apartment simply because they have

a warrant to search another that is nearby." *Voustianiouk*, 685 F.3d at 208. Here, law

enforcement obtained a warrant to search Franzone's hotel room based on the belief that his

possessions remained there. Upon discovering that this was no longer the case, law enforcement

did not seek a new, accurate warrant, despite the fact that, as in *Voustianiouk*, "[t]he evidence

wasn't going anywhere, and neither was their suspect." *Id.* at 208.  Law enforcement's search of

a location other than the one authorized by the First Warrant renders this search and seizure

warrantless.

### 4.  Exclusionary Rule

The seizure of Franzone's possessions from the Westin Hotel violated Franzone's Fourth

Amendment rights because it was not pursuant to a warrant or an exception to the warrant

requirement.  As addressed *supra* in Section III.A.4, however, the application of the exclusionary

rule is only appropriate where law enforcement violates a suspect's Fourth Amendment rights

"deliberately, recklessly, or with gross negligence . . . [or] recurring or systemic negligence."

*Davis*, 564 U.S. at 240 (citation omitted).  In contrast, "when the police act with an objectively

reasonable good-faith belief that their conduct is lawful, or when their conduct involves only

simple, isolated negligence," the exclusionary rule does not apply.  *Id.* at 238 (internal quotation

marks omitted).

I find that this was likely a good faith mistake by law enforcement.  Prior to the Supreme

Court's 2012 decision in *Jones*, the majority of courts determined whether a search had occurred

for Fourth Amendment purposes solely by asking whether a person had a reasonable expectation

of privacy in the place searched.  *See Katz*, 389 U.S. at 361 (Harlan, J., concurring).  The

progeny of *Katz* included Second Circuit cases such as *United States v. Rahme*, 813 F.2d 31 (2d

Cir. 1987), which held that "when a hotel guest's rental period has expired or been lawfully

terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in

any articles therein of which the hotel lawfully takes possession . . . even when the accused

retains significant property interests in the seized item or place," *id.* at 34 (citations omitted).

*Rahme* solely addresses the *Katz* test and does not speak to whether a search or seizure occurred

under *Jones*.[8]  There have not been any Second Circuit cases addressing the possessions of a hotel guest whose stay has been terminated since the Supreme Court expanded the test for a search or seizure in *Jones*.  Thus, it is not grossly negligent for law enforcement to rely on older case law to determine that no Fourth Amendment interests adhere to possessions taken out of a formerly occupied hotel room.  Furthermore, there is no evidence of bad faith on the part of law enforcement here.  I find that suppression of the evidence gained from the seizure at the Westin is not warranted. Therefore, Franzone motion to suppress evidence from the Westin is DENIED.[9]

### C. *Third Warrant to Search Franzone's Gmail Account*

Franzone alleges that the application for the Third Warrant contained five material misstatements made in reckless disregard for the truth, necessitating suppression of the Third Warrant.  He further argues that the Third Warrant was fatally overbroad, providing another, independent basis for suppression.  I find that the statements were not misstatements recklessly made, and that the Third Warrant was not overbroad.  Therefore, Franzone's motion to suppress evidence from his Gmail account is DENIED.

### 1. Alleged Errors in Affidavit Supporting the Third Warrant

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant may challenge a search warrant "where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information."  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (citing *Franks*, 438 U.S. at 164–72).  This is a high bar, as "[e]very statement in a

---

[8] I note, however, that there are significant factual disparities between the instant case and *Rahme*.  In making the point that there are areas of the law that could have created reasonable confusion for law enforcement, I do not reach the question of whether a search and seizure of the Westin possessions indeed occurred under *Katz*.

[9] As I find there is no basis for suppression of the two electronic devices seized at the W Hotel or the four electronic devices seized at the Westin Hotel, it follows that the search of these six devices pursuant to the Second Warrant does not present a fruit-of-the-poisonous-tree issue.

warrant affidavit does not have to be true." *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) (citing *Franks*, 438 U.S. at 165). To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show by a preponderance of the evidence that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *Canfield*, 212 F.3d at 717–18 (quoting *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998)) (alterations adopted); *see also United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008).

For defendant to carry his burden on the first element, he must show that the omissions or erroneous statements at issue, "when read in context" were "designed to mislead" or "made in reckless disregard of whether they would mislead" the magistrate. *United States v. Awadallah*, 349 F.3d 42, 67–68 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990) (emphasis omitted)). With respect to the materiality element, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Canfield*, 212 F.3d at 718 (internal quotation marks omitted). If, after subtracting the erroneous information or adding the omitted information, the corrected affidavit still supports probable cause, the errors were not material. *Id.*; *see also Gates*, 462 U.S. at 236.

a.   Date of Bankruptcy Petition

The first misrepresentation raised by Franzone is Postal Inspector O'Rourke's statement in the affidavit in support of the Third Warrant that "on or about June 2019, FF Fund filed for bankruptcy protection." (O'Rourke Aff. ¶ 10.) This is inaccurate. FF Fund first filed for bankruptcy on September 24, 2019. (*See* Doc. 83, Ex. D.)

Franzone argues that this is an intentional misrepresentation because O'Rourke, by his own admission, had reviewed filings in the bankruptcy proceeding and therefore should have known his statement was untrue.  (*See* Def. Mem. 2 at 8.)  There is, however, a simpler, more logical and less nefarious explanation.  After stating that FF Fund filed for bankruptcy around June 2019, O'Rourke cites to paragraph 11(d) of the Complaint, which states:  "Beginning in or about June 2019, several of Wealth Manager-1's clients, including the Trust, sent FF Fund redemption requests.  FF Fund did not fulfill the redemption requests and instead filed for bankruptcy protection."  This paragraph of the Complaint is literally true, but could give the misimpression that the events mentioned occurred in close succession in June 2019.  O'Rourke's citation to a paragraph of the Complaint that mentioned both "June 2019" and "filed for bankruptcy protection" indicates that his misrepresentation was a good-faith mistake, not a deliberate falsehood.

In any event, O'Rourke's misstatement about the date of the initial bankruptcy was not material to the issuance of the Third Warrant.  First, the warrant application contained an accurate statement that FF Fund filed for bankruptcy in September, in addition to O'Rourke's misstatement, so it is not clear that the magistrate judge was in fact misled.  The Complaint was attached to and incorporated by reference in O'Rourke's affidavit.  (O'Rourke Aff. ¶ 8.)  The Complaint made it clear that "[i]n or about September 2019, FF Fund filed for bankruptcy."  (*See* Compl. ¶ 14(a).)  Therefore, at most there were conflicting statements in the warrant application about when the bankruptcy commenced, and one of those statements provided the correct timing. The magistrate judge may have inferred that O'Rourke's statement was a mistake, given that there were two conflicting statements and O'Rourke's faulty logic was easily traceable through his citation.  Second, the basic implication of O'Rourke's statement—that investors submitted

redemption requests in June 2019 and FF Fund declared Chapter 11 bankruptcy before it would

have to satisfy them—remained accurate, whether the bankruptcy was filed in June or

September.  The effective date for the June redemption requests was September 30, 2019, (Def.

Mem. 2 at 8), meaning FF Fund had to fulfill or default on the requests by that date.  Knowing

the correct date of the bankruptcy filing, the connection between the redemption requests and the

bankruptcy seems even stronger, as FF Fund filed for Chapter 11 bankruptcy mere days before

the redemption requests at issue would have come due.  Third, the core facts supplying probable

cause have to do with Franzone's alleged scheme to defraud investors.  The bankruptcy is—in

the Government's telling—a consequence of the fraud, not the fraud itself.  Thus, the core facts

supplying probable cause outline Franzone's actions predating the bankruptcy when he was

allegedly attempting to defraud investors, and the date of the bankruptcy petition is not material.

b.  <u>Appointment of the Chief Restructuring Officer</u>

Franzone next raises O'Rourke's incorporation of the Complaint's statement that FF

Fund's Chief Restructuring Officer ("CRO") was court-appointed, when in fact he was court-

approved.  (Def. Mem. 2 at 9.)  "Court-appointed" implies that the bankruptcy judge had

assigned a CRO to replace Franzone after a finding of negligence or wrongdoing.  (*Id.*)  There

was no such finding of misconduct.  (*Id.*)  Instead, Franzone retained the CRO, who was

subsequently approved by the bankruptcy judge.  (*Id.*)

Again, Franzone argues that O'Rourke "knew or should have known of this error" long

before he drafted his affidavit because he claimed to be tracking the bankruptcy case.  (*Id.*)

O'Rourke stated that he was relying, in part, on "information obtained during the course of this

investigation, directly or indirectly from other sources, including . . . public filings in FF Fund's

bankruptcy proceedings."  (O'Rourke Aff. ¶ 3.)  O'Rourke did not claim to closely review every

29

single filing in the bankruptcy case, nor is he a bankruptcy law expert to whom it would be evident that "court-appointed" entails a finding of wrongdoing.  I do not find that O'Rourke's failure to notice and correct the subtle distinction between "court-appointed" and "court-approved" in the Complaint constitutes deliberately or recklessly false or misleading information.

The thrust of the bankruptcy portion of the Complaint is that a wealth manager became suspicious of Franzone in spring 2019, multiple investors then submitted redemption requests, FF Fund announced a wind-down that summer and filed for Chapter 11 bankruptcy that fall, and a CRO was put in place to manage the bankruptcy.  (Compl. ¶¶ 11–14.)  The Complaint states that "[i]n the course of FF Fund's liquidation, the court-appointed [CRO] has endeavored to locate and value FF Fund's assets."  (*Id.* ¶ 14(b).)  Removing the word "court-appointed" would barely change the meaning of that sentence, much less disturb the magistrate's finding of probable cause.

### c.  Timing of the Liquidation

The third misstatement at issue is O'Rourke's failure to correct the portion of the Complaint stating that FF Fund was in liquidation at the time of Franzone's arrest, when in fact the company filed a notice of intent to pursue liquidation six days after Franzone's arrest.  (*See* Def. Mem. 2 at 9–10.)  FF Fund filed for Chapter 11 bankruptcy, often called reorganization, on September 24, 2019, and began the process of liquidating on April 28, 2021.  Therefore, while it was true that FF Fund was already in bankruptcy proceedings at the time of Franzone's arrest, the company was not yet in liquidation proceedings.

Franzone demonstrates that the Government was on notice of this error in the Complaint prior to seeking the Third Warrant.  It was raised in Franzone's reply brief on the first motion to

suppress, as well as in the corresponding oral argument.  (*See* Doc. 39 at 28–29; Oral Arg. 1 Tr. at 58:20–61:21.)  The Government admitted as much at oral argument on this motion, stating that Franzone's arrest preceding FF Fund's liquidation "was known to the government . . . what we wish we had done was included a footnote in the affidavit saying to the extent the complaint says liquidating, it's actually just bankruptcy, and we didn't do that, and that was an oversight on the government's part."  (*See* Transcript of Sept. 26, 2023 Oral Argument ("Oral Arg. 2 Tr.") at 34:12–22.)  Although this was a careless error on the Government's part, when read in the context of the entire warrant application, O'Rourke's failure to correct the Complaint's use of the word "liquidating" was not clearly designed to mislead or made in reckless disregard of whether it would mislead the magistrate judge.  *See Awadallah*, 349 F.3d at 67–68 (citation omitted).

The timing is relevant because Franzone contends that his arrest, not FF Fund's inability to satisfy redemption requests, triggered the liquidation.  (Def. Mem. 2 at 10–11.)  Assuming this aspect of the record was corrected and it was clear that Franzone's arrest preceded the liquidation, the Government would have nonetheless presented sufficient evidence to support a probable cause finding.  Although the bankruptcy and liquidation could be considered relevant consequences of the alleged fraud, the critical facts supporting probable cause here have to do with the fraud itself, and thus predate any discussion of liquidation.

### d.  Monthly Performance Reports

Franzone next takes issue with the statement that he "sent victims of the FF Fund scheme monthly 'performance reports' attached to email communications."  (O'Rourke Aff. ¶ 15.) Franzone argues that this is misleading because the main channel for disseminating monthly reports was an Intralinks document-sharing portal that sent email notices, not Franzone's personal Gmail account.  (Def. Mem. 2 at 11–12.)  Franzone acknowledges that O'Rourke cited

an example of Franzone sending out a performance report from his personal Gmail, but retorts that O'Rourke's affidavit "implied that Mr. Franzone's Gmail account likely contained thousands of allegedly false performance reports and that the single performance-related email referenced . . . was merely the tip of the iceberg." (*Id.*) By Franzone's own admission, O'Rourke's statement is literally true. Even if I were to credit the argument that O'Rourke's statement implied that Franzone's Gmail account had sent thousands of performance reports—and I need not decide whether to credit that argument—an accurate statement that might imply or suggest something misleading simply cannot pass muster under the high bar of *Franks*.

e.  Shikiar Email

The last statement at issue is O'Rourke's description of the recipient of a May 30, 2017 email from Franzone, Stuart Shikiar, as a "prospective investor." (O'Rourke Aff. ¶ 15(b).) Franzone states that Shikiar was not a prospective investor, and this should have been clear because it was evident from the email that "(1) Mr. Franzone and Mr. Shikiar had never met, (2) Mr. Franzone's email was intended as an introduction and offer to 'compare notes on both our businesses,' and (3) Mr. Franzone's email made no mention of the FF Fund." (Def. Mem. 2 at 12.)

Franzone fails to illustrate why it should have been clear to O'Rourke that Shikiar was not a prospective investor. The fact that Franzone and Shikiar had never met is irrelevant to whether Shikiar was a potential investor. Franzone's statement that his email made no mention of FF Fund is undermined by his immediately preceding statement that he offered to "compare notes on both our businesses." More fundamentally, as the Government points out, the first communication in the thread with Shikiar was from Gregory Hersch, the founder of Florence Capital Advisors, a Registered Investment Advisor ("RIA") who had previously referred

potential investors to the defendant.  (*See* Doc. 83, Ex. H.)  Hersch introduces Shikiar to

Franzone, stating that he and Shikiar had met "to discuss our respective RIA's" and that Shikiar

"is interested in learning more about your fund."  (*Id.*)  In other words, this email chain shows

the founder of an investment firm who had previously referred investors to Franzone introducing

him to Shikiar and indicating the two should discuss FF Fund, after which Shikiar and Franzone

set up a call.  There is ample basis for O'Rourke to conclude, based on this exchange, that

Shikiar was a potential investor.

### 2.  Overbreadth

Franzone alleges that the Third Warrant was overbroad because O'Rourke's affidavit

focused on Franzone's use of email, but the warrant ordered Google to produce expansive

categories of data associated with Franzone's account, far beyond just his emails.  (Def. Mem. 2

at 13.)  Indeed, the Third Warrant directed Google to produce the files and contents associated

with Franzone's account related to "Google Calendar, Google Chat, Google Contacts, Google

Drive, Google Hangouts, Google Maps, Google Meet, Google Messages, Google Pay, Google

Photos, Google Voice, Duo, Location History, and YouTube," as well as email content,

subscriber and payment information, Chrome Browser and search history records, device

information, information regarding linked accounts and cookies, transactional records, customer

correspondence, and backup records.  (Third Warrant § II.)

A warrant is overbroad if its "description of the objects to be seized is broader than can

be justified by the probable cause upon which the warrant is based."  *United States v. Lustyik*, 57

F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d

Cir. 2013)) (alterations adopted).  "In scrutinizing search warrants for electronically stored data,

the Court must remain cognizant of 'the special problems associated with searches of

[electronically stored data] which . . . can be particularly intrusive.'" *United States v. Okparaeka*, No. 17-CR-225, 2018 WL 3323822, at *11 (S.D.N.Y. July 5, 2018) (quoting *United States v. Ulbricht*, 858 F.3d 71, 101 (2d Cir. 2017)).

The application for the Third Warrant establishes probable cause to search Franzone's emails. (O'Rourke Aff. ¶¶ 14–15.) Cognizant that a magistrate's finding of probable cause "is entitled to substantial deference," *Rosa*, 11 F.3d at 326, there are also sufficient grounds to reach the probable-cause threshold for many additional categories of data, including Google Contacts, (O'Rourke Aff. ¶ 14 (stating that individuals who engage in fraud commonly use electronic devices to "keep track of co-conspirators' and victims' contact information")); Google Pay, (*id.* ¶ 14 (stating that individuals who engage in fraud commonly use electronic devices to "keep a record of illegal transactions or criminal proceeds for future reference")); and Google Photos, (*id.* ¶ 18 (stating belief that Franzone's account likely to contain "screen shots and, and [sic] other images" evidencing a scheme to defraud investors)). Nonetheless, Franzone is correct that the Third Warrant could be considered overbroad at the margins. Nowhere does the O'Rourke Affidavit purport to establish probable cause that evidence, fruits, or instrumentalities of Franzone's alleged wire and securities fraud would be found in his Google Maps, Duo, or YouTube accounts, for instance.

The Government argues that it is appropriate to search everything associated with Franzone's Gmail account to determine what comes within the scope of the warrant. (Doc. 89 ("Gov. Opp'n 2") at 15.) The Government notes that "[i]t has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized." *United States v. Ulbricht*, No. 14-CR-68, 2014 WL 5090039, at *14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858

F.3d 71 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).  As *Ulbricht* makes clear, the line of cases supporting the Government's ability to search an entire premises for evidence only applies when there is probable cause supporting the entirety of that search, and upon that probable cause a warrant issues.  *Ulbricht* stands for the proposition that the Government can validly look through the entirety of Franzone's email account authorized by the Third Warrant, even though not every email will be evidence of a crime.  It does not mean that the Government can conduct boundlessly rifle through separate accounts and applications associated with Franzone for which there is no probable cause that evidence will be found in the hope that they stumble upon something useful.

There is also a line of cases permitting the Government to obtain the entirety of a hard drive or an email account, including in its scope information for which there is no probable cause to search, in order to conduct a search for information contained within the four corners of the warrant.  *See, e.g.*, *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Acct. xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 392 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) (finding that "courts have routinely upheld the seizure or copying of hard drives and other storage devices in order to effectuate a proper search for the categories of documents or files listed in a warrant" and holding that the same logic applies to email accounts).  However, such cases are inapposite. *Matter of xxxxxxx@gmail.com* explains that allowing the Government to seize the entirety of a hard drive or email account stems from the practical inability of the Government to search a hard drive or email account without having a copy of it to search.  *See id.* at 393 (noting that "[i]n light of the significant burdens on-site review would place on both the individual and the Government, the creation of mirror images for offsite review is constitutionally permissible in

most instances" (internal quotation marks omitted)); *see also id.* at 394 (collecting cases). This does not mean that the Government can seize additional categories of information that are not intermingled with the information to be searched. Furthermore, cases like *Matter of xxxxxxx@gmail.com* address the inverse of the issue here, as the challenge to the warrant is that it is too narrow to sustain the search, not that it is overbroad in the first instance.

Despite the overbreadth of the Third Warrant, there is no basis for suppression. The exclusionary rule "does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The majority of the Third Warrant was supported by probable cause. While there was some overbreadth at the fringes, the Third Warrant was not materially overbroad, and any minor scope issues would not have prevented good-faith reliance on the warrant by the executing officers. Nor is there any evidence that the issuing magistrate acted in anything less than a detached and neutral manner. The evidence gleaned from the Third Warrant is not subject to suppression, and Franzone's motion to dismiss the Third Warrant is DENIED.

V.    **Conclusion**

For the foregoing reasons, Franzone's motions to suppress are DENIED.[10]  The Clerk of

Court is respectfully directed to close the open motions at Docket Entries 32 and 81.

SO ORDERED.

Dated: April 2, 2025
        New York, New York

Vernon S. Broderick
United States District Judge

---

[10] Franzone also moves for the return of all his seized belongings.  (Def. Mem. 1 at 35–36.)  Franzone's motion for
the return of his property is denied.  Pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, Franzone
must file any motion for the return of his seized property in the district court where the property was seized, which
in this case is the Southern District of Florida.  I note that Franzone's criminal case is ongoing, and the
Government's "retention of the property generally is reasonable . . . [i]f the United States has a need for the property
in an investigation or prosecution."  *Aigbekaen v. Fu*, No. 18-CV-6529, 2021 WL 1176167, at *2 (E.D.N.Y. Mar.
29, 2021) (quoting Fed. R. Crim. P. 41, advisory committee notes).