

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 15, 2026

**BY EMAIL**

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:      *United States v. Andrew Franzone,* 21 Cr. 446 (VSB)

Dear Judge Broderick:

      The Government respectfully submits this letter in response to the defendant's sentencing memorandum dated September 22, 2025 (the "Defendant's Sentencing Submission" or "Def. Mem."). In that memorandum, the defendant disputes many of the facts set forth in the final PSR and objects nearly wholesale to the Probation Office's ("Probation") Guidelines calculation. (*See* Def. Mem at 4-32). With the exception of the application of an offense level reduction for acceptance of responsibility, the Government agrees that Probation's Guidelines calculation is correct and respectfully requests that the Court enter such a finding. Although a hearing to resolve disputed issues of fact relevant to sentencing is presently set for February 6, 2026, given the extensive documentary record set forth in the exhibits attached both to this submission and the defendant's sentencing memorandum, the Government respectfully submits that a hearing is not necessary, and that the Court can make the necessary factual findings on the record now before it. Accordingly, the Government respectfully requests that the Court adjourn the scheduled hearing until such time as the Court is able to determine whether, in actuality, it requires the presentation of testimony.[1]

### I.    PROCEDURAL BACKGROUND

      On or about July 8, 2021, a grand jury sitting in this District returned Indictment 21 Cr. 446 (VSB) (the "Indictment"), charging Franzone in two counts with securities fraud and wire fraud in connection with his conduct in managing his investment fund, FF Fund I, L.P. ("FF Fund" or the "Fund"). (Dkt. 4). On April 11, 2025, on the eve of trial, Franzone entered a plea of guilty to both counts of the Indictment, without the benefit of a plea agreement. At his plea, Franzone allocuted as follows:

---

[1] Following the Court's adjudication of the disputed factual issues, or if necessary following a hearing, the Government intends to make an additional submission regarding the appropriate sentence under the United States Sentencing Guidelines and the factors set forth in Section 3553(a).

> From in or about 2014 to September 2019, while I managed FF Fund I, I misrepresented to investors of the fund that the fund was highly liquid and I did not disclose the true nature of every investment. I caused monthly performance reports to be sent to investors by e-mail. The performance reports did not completely disclose the full nature of the portfolio or identify the investments. Investors sent wires to purchase limited partnership interest in the fund, including wires that went through the Southern District of New York.

(Dkt. 182, at 22:16-25). In response to follow-up questions from the Court, Franzone confirmed, among other things, that he knew his conduct was wrong, that he made misstatements and omissions in order to induce investors to send him their money, and that he was aware that liquidity was important to investors. (Dkt. 182, at 23-24).

On or about June 3, 2025, Probation circulated a draft pre-sentence report (the "Draft PSR") to the parties. In response, Franzone provided Probation with a 22-page, single-spaced letter objecting to (or commenting on) nearly every paragraph of the PSR and almost every offense-level enhancement that informed Probation's Guidelines calculation. The Government subsequently provided Probation with its responses to Franzone's objections. On or about September 18, 2025, Probation issued a revised report (the "PSR") addressing Franzone's objections and the Government's responses. Probation's handling of Franzone's objections, on an objection-by-objection basis, is set forth at pages 30-51 of the PSR. (*See* PSR, at 30-51).

On September 22, 2025, Franzone filed his sentencing submission, in which he reiterated his objections to the PSR's Guidelines calculation. Despite his statements at his plea, Franzone now appears to argue that his crime was severely limited in scope—he "deceived [only] a small number of [the Fund's] investors as to the liquidity of the Fund's portfolio." (Def. Mem. at 24.) As a result, Franzone argues, Probation's Guidelines calculation improperly accounts for loss amount, the number of victims, and the harm that befell victims, among other things. Franzone also demands a hearing on the issue of forfeiture. Franzone's arguments are meritless and no hearing is required on either the Guidelines calculation or the forfeiture amount.

## II.   FACTUAL BACKGROUND

### A.   Formation of FF Fund I

In or about 2010, Franzone and a partner ("Individual-1") formed Farrell Franzone Investments LLC ("Farrell Franzone"), an investment fund that traded preferred securities and options and would maintain a highly liquid portfolio for its investors. (PSR ¶ 13). During the relevant time period, Franzone and Individual-1 divided their responsibilities with respect to the Fund: Franzone was primarily responsible for soliciting investors, reporting to investors, and other aspects of fund management, while Individual-1 devoted himself to trading. (PSR ¶ 15). As part of this division of labor, Franzone had sole signatory authority over a number of Farrell Franzone's

bank accounts. (PSR ¶ 15). Taking advantage of that authority, and unbeknownst to Individual-1, Franzone used investor funds to invest in private companies, real estate ventures, and loans, which were highly illiquid and speculative. Upon learning of Franzone's actions, on May 30, 2014, Individual-1 wrote to Franzone:

> What a punch in the gut. For the past 24 hours, [I] have been at a complete loss for words to describe my feelings as this information has been brought to light about your vast real estate empire building exercise that has apparently been going on for several years. It is the understatement of the year to say that this was done without my knowledge or consent. I am very concerned here for numerous reasons and because of this, [I] need to take steps here as a 50% owner of this business to get a handle on what is going on."

(Ex. A, at 1-2.) A few months thereafter, Individual-1 left the Fund, taking with him the investors he had brought into Farrell Franzone. (*See* Ex. B, Separation Agreement). After Individual-1's exit, Franzone renamed Farrell Franzone FF Fund I, L.P. ("FF Fund" or the "Fund"). Franzone served as the General Partner and was responsible for the management of the monies invested in FF Fund. (PSR ¶ 17). Unlike with the prior fund, Franzone did not have a partner; he was the sole manager of the Fund.

### B. Overview of the Scheme

Though the split with Individual-1 should have served as a wake-up call, Franzone instead doubled-down. From in or about 2014 through in or about FF Fund's bankruptcy in September 2019, Franzone engaged in a scheme to defraud FF Fund's more than 100 investors, who had collectively invested more than $50 million in the Fund. (*See* Ex. C, Declaration of the Chief Restructuring Officer ¶ 4 ("the debtor has approximately 113 limited partners"); Ex. D, Spreadsheet of FF Fund Limited Partner Contributions and Redemptions). Franzone carried out the scheme in two ways. *First*, he falsely represented to investors that their money would be invested primarily in the highly liquid stock and options markets, with only a small percentage of investments being placed in private, highly illiquid companies. *Second*, he sent FF Fund's investors monthly reports that obscured the kinds of assets in which their monies had been invested, were based on fictitious asset valuations generated by Franzone, and consistently showed a positive return, never reporting a loss from January 2014 through March 2019. These misleading monthly reports not only attracted investments, but artificially inflated Franzone's management fee, which went up as the purported value of assets under management increased.

### C. Representations to Investors

Franzone solicited and received investments from all manner of individuals, sophisticated and unsophisticated, including friends from preparatory and business school; the Formula One car racing community—of which Franzone was a fan and avid member; and even his former place of employment. (PSR ¶ 18). Franzone represented to investors that the funds would be used primarily

for trading preferred shares and options, with limited investments in illiquid, private companies. Some examples of those repeated representations to investors are as follows:

- In describing its "Investment Program," the private placement memorandum ("PPM") for the Fund devoted over five pages to describing its strategies for trading in options and preferred securities (*see* Ex. E, PPM, at 4-9), but a mere paragraph to "Private/Non-Exchange Traded Investments," conveying the impression that the Fund primarily concerned equities, bonds, and derivatives trading (*see* Ex. E, PPM, at 9).

- Similarly, the "Trading Philosophy" section of the FF Fund website that set forth the Fund's investment strategy went on at length about the Fund's approach to trading options and preferred securities, but contained only one paragraph at the bottom of the page about "Private/Non-Exchange Traded Investments." (*See* Ex. F, Website).

- In soliciting potential investors, Franzone emphasized the Fund's returns from trading public equities and bonds. For example, on July 25, 2016, Franzone informed a prospective investor by email that the Fund was a "multi-strategy fixed income hedge fund" that "typically appeals to people who are looking for an annual income stream from preferred stocks, bonds, or other high-yielding, asset-backed public or private investments" and that Franzone "update[d] the fund's track record" weekly so that investors could "follow along with the trading returns in real-time between the official monthly investor statements." (*See* Ex. G).

- In interviews with the Government and through victim impact statements, many investors have consistently informed the Government that Franzone told them that FF Fund was a trading-based fund that would be investing in highly liquid options and preferred securities. For example, one victim writes in a victim impact statement, "Franzone during my due diligence both verbally and in an email indicated that 80% [of] his investments were in highly liquated preferred shares and options, in line with the disclosure in the PPM. I was stunned when I reviewed the [post-bankruptcy] Chapter 11 disclosure statement . . . of the FF Fund 1 illiquid investments." (*See* Ex. H-3, at 5.) Similarly, another writes, "[w]hen I and several members of my family invested over $500,000 with Franzone, we had confidence in him and trusted that he was primarily trading options and preferred stocks as he said he was. I understood that the funds would remain relatively liquid and available if and when I needed them." (*See* Ex. H-4, at 1.)

- After investors invested in the Fund, Franzone kept up the pretense, regularly sending investors emails that emphasized his trading activity or trading returns. For example, on February 27, 2017, Franzone wrote an investor that gains for the month were approximately 1.5% "with 2 trading days left to go"; on April 17, 2017 Franzone wrote that he could not talk "during the final 2 hours of the trading day; and on May 30, 2017, Franzone wrote to a prospective investor that he was "just trading on the

screens throughout all of the days." Those emails, along with a collection of similar emails, are attached as Exhibit I.

- Furthermore, investors' expectations as to the Fund's liquidity were underscored by the Fund's redemption provisions, which—after the first year—permitted investors to redeem their investments with 90 days' notice. As Franzone himself explained in an email on September 28, 2016: "the liquidity terms are 90 days notice, quarterly, after a 1-year lock." (Ex. J; *see also* Ex. E, PPM, at 16). Such redemption policies make complete sense for a fund that trades in highly liquid stocks and options, but would be (and ultimately proved to be) untenable with a fund that invests primarily in private, illiquid assets.

This is all on top of the fact that Franzone *admitted* at his plea that he "misrepresented to investors of the fund that the fund was highly liquid" and "did not disclose the true nature of every investment." (Dkt. 182, at 22:16-25).

Despite Franzone's repeated representations to investors that his fund was a highly liquid fund with a trading-based strategy, in reality the vast majority of investor funds was going toward long-term illiquid investments in private companies. After the Fund filed for bankruptcy in September 2019, a Chief Restructuring Officer ("CRO") took over operations of the Fund. In his first report to the Bankruptcy Court, the CRO emphasized the "illiquid" nature of many of the fund's investments. (Ex. K, Bankr. Dkt. No. 170, at 2). The CRO explained that the Fund had ten wholly-owned subsidiaries, with substantially all of the Fund's investments and assets concentrated in the FF Fund, F5 Business, and F6 entities. (Ex. K, Bankr. Dkt. No. 170, at 2). The FF Fund subsidiary held only three direct investments—two investments consisting of illiquid, privately held shares not tradeable in the public market, and one special purpose vehicle investment. (Ex. K, Bankr. Dkt. No. 170, at 2, 8). The F6 entity held four liquid hedge fund investments, which the CRO estimated could be liquidated for approximately $280,000. (Ex. K, Bankr. Dkt. No. 170, at 2, 8).

The majority of the Fund's investments, however, were held in the F5 entity, which consisted mainly of "(i) illiquid, non-tradeable privately held shares in early state or start-up companies; (ii) minority interests in real estate partnerships; or (iii) unsecured promissory notes with long term maturities." (Ex. K, Bankr. Dkt. No. 170, at 2). Among the investments held in F5 were: (1) five investments in entities that own real estate; (2) two investments in entities in the documentary film production industry that had not produced any returns; (3) one investment in a "spec" home in Miami, Florida; (4) 14 investments in illiquid, non-tradeable privately held share or promissory notes made to early state or start-up companies; (5) nine investments that involve or were expected to involve litigation; and (6) nine investments that were likely of no current value because the CRO either confirmed the entity was no longer operating or could not confirm through the investment's principals whether the company was operating.[2] (Ex. K, Bankr. Dkt. No. 170, at

---

[2] An entity known as the F3 subsidiary was established to invest in real estate and prior to May 2019, held 87 condominium units in West Palm Beach. (Ex. K, Bankr. Dkt. No. 170, at 2).

9-11). Several of the entities in which Franzone invested Fund monies were entities owned and controlled by his personal friends, including, for example, a $250,000 investment in a pet clothing business known as the "Woof Woof Box" owned and operated by his ex-girlfriend. (PSR ¶¶ 22, 26). Thus, despite Franzone's representations as to the Fund's investment portfolio, nearly all investor money had been placed into illiquid, private investments, many of which were worthless.

### D. FF Fund's Monthly Reports

Every month, the Fund's investors received a report from the Fund on the status of their investment. (PSR ¶ 19). Those reports did not list the specific investments or otherwise break down the assets owned by the Fund. Instead, the reports were a mere single-page document that in just a few lines listed only the purported aggregate returns for the Fund. (PSR ¶ 19; *see e.g.,* Ex. I at 2-3). By structuring the report in this manner, Franzone concealed from investors that their investment had increasingly—and, ultimately, almost entirely—been placed in illiquid, private ventures. (*See* Ex. K, Bankr. Dkt. No. 170, at 4-5, 8-11). Moreover, the monthly reports consistently showed a positive rate of return for the Fund, painting an extraordinarily rosy performance picture. Indeed, for more than five years, from January 2014 through March 2019, *not one* monthly report showed a negative rate of return. (PSR ¶ 19; *see* Ex. L (Emails showing returns from monthly reports); Ex. M (Administrator report showing fund returns from inception to March 2019)).

In reality, however, the value of the Fund's illiquid assets and the corresponding rates of return were a work of fiction authored by Franzone. Despite Franzone's protestations to the contrary (*see* Def. Mem. at 30 & n.38), and his repeated representations to investors that the Fund would be audited,[3] there were no outside auditors checking the valuations. On June 20, 2020, shortly after the discovery of Franzone's fraud by an individual who had introduced several investors to Franzone ("Individual-2"), Franzone sent an email to Individual-2 attaching the audit engagement letters for the Fund. (*See* Ex. O). Those letters included one engagement letter signed on November 4, 2015, to audit the Fund's 2014 financial statements, and one letter dated December 18, 2018 to audit the Fund's 2015, 2016, and 2017 financial statements. (*See* Ex. O, at 2, 8). Thus, an auditor was not even engaged to attempt to conduct an audit of the Fund's 2015, 2016, and 2017 financial statements until 2018, and those three audits were never completed. Indeed, upon discovering Franzone's fraud in approximately May of 2019, Individual-2 confronted Franzone via texts about the audits, stating: "You are claiming that you did not do audits for 2015-2017 because of client onboarding issues with RSM? For 3 years? I better have heard that wrong. Why weren't the audits done? I expect a truthful answer right now. You have no idea how serious I am." (Ex. P). Franzone responded with a long series of virtually incomprehensible excuses. (*See* Ex. P).

Moreover, in his initial status report to the Bankruptcy Court, the CRO stated that although he had received inquiries from various stakeholders concerning the value of the Fund's

---

[3] S*ee, e.g.*, Ex. E, PPM, at 28 ("books of account will be audited at the end of each fiscal year"); Ex. N (email to investor on November 9, 2016 stating difficulties in withdrawing funds because the Fund is "now a highly audited and administered fund").

investments, for reasons "including the illiquid nature of many of such investments," the CRO had not valued and not been able to value any of the investments or assets of the Debtors," nor had the CRO been able to confirm "that the value of such investments or assets were accurate or were accurately reflected on the books and records of FF Fund" prior to the CRO's appointment. (Ex. K, Bankr. Dkt. No. 170, at 2). An individual ("Individual-3") Franzone engaged to assist with the Fund's setup and structure in 2018 had the same problem. On November 14, 2018, Individual-3 wrote to Franzone: "The biggest thing we need to move forward is to identify how each of the items on the attached listing is valued every month. If an investment is not being valued each month, how often is it being valued? How is it being valued for the audit?" (Ex. Q).

### E. Franzone's Misappropriations

The positive rates of return reflected in FF Fund's monthly reports not only induced investors to put their money into the Fund, they also inflated Franzone's fees, which were based on the assets under management and the profits the Fund generated. (*See* Ex. E, PPM, at 18-20). In total, Franzone was paid roughly $9.1 million (~$6 million in fees and ~$3 million in purported expenses) from the Fund over approximately five years. (PSR ¶ 20). Among other things, these payments went to fund a lavish lifestyle that included Franzone's ownership of his own Formula One car racing team. (*See, e.g.*, Ex. R (email to investor inviting him to "come over and check out our hangar and race shop with our 8 stock cars while you're in town"; Ex. S (photographs of hangar with race cars)).

### F. The Fraud Unravels

In approximately May of 2019, investors uncovered Franzone's scheme and attempted to redeem their investments. Unable to pay the redemptions, the Fund declared bankruptcy. At the time of the Fund's bankruptcy filing, nearly all of the Fund's assets were in highly illiquid private investments, and recovery was uncertain. (*See* Ex. K, Bankr. Dkt. No. 170). A little over year after the bankruptcy filing, the Fund's largest investor, the Linden West Trust, and a second investor abandoned their claims in the bankruptcy. Approximately three years after that, in October 2023, one of the Fund's illiquid investments—a company known as CoreWeave—paid off in a fortuitous and unprecedented manner with the company making a tender offer for the Fund's shares that amounted to more than a 30,000% return. (*See* Ex. T, Bankr. Dkt. 627). Liquidation of a portion of the CoreWeave shares has allowed investors who participated in the bankruptcy to recover their invested funds at a profit.

Accordingly, the record evidence—including the Fund records, emails, victim statements, and the like attached hereto—more than meets the requirement of establishing the material facts at issue by a preponderance of the evidence. Franzone's various thin and self-serving denials contained in his objections to the PSR and sentencing submission do not alter that.

### III. APPLICABLE LAW

Courts must resolve material factual disputes before sentencing a defendant. *See United States v. Berndt*, 127 F.3d 251, 257 (2d Cir. 1997). "[T]he Guidelines make clear that '[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.'" *Berndt*, 127 F.3d at 257 (quoting Guidelines § 6A1.3(a). But courts also have wide discretion in how to resolve such disputes and not every dispute requires an evidentiary hearing with live testimony. *United States v. Ghailani*, 733 F.3d 29, 54 (2dCir. 2013). The "sentencing court is afforded broad discretion in resolving disputed factual issues, including the discretion to decide whether a hearing is necessary and how such a hearing should be conducted." *United States v. Ambrosio*, 129 F.3d 114 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). Indeed, the sentencing court "is entitled to rely on any type of information known to it," in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). To that end, a defendant does not have a confrontation right at sentencing and hearsay evidence may be considered. *See United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005).

A district court must find facts relevant to sentencing by a preponderance of the evidence. *See United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *United States v. Garcia*, 413 F. 3d 201, 220 n.15 (2d Cir. 2005); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

### IV. DISCUSSION

#### A. The PSR Calculation

The PSR calculates the applicable Guidelines range as follows:

- Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two are grouped together into a single group because the counts involve the same victims and the same acts or transactions.

- The applicable guideline is U.S.S.G. § 2B1.1.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the loss or intended loss amount is greater than $25 million but less than $65 million, 22 levels are added to the base offense level.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved ten or more victims, including substantial financial hardship to at least one victim, the offense level is increased by two levels.

- Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, the offense level is increased by two levels.

- Pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii), because the offense involved a violation of securities law and, at the time of the offense, the defendant was an investment adviser, or a person associated with an investment adviser, the offense level is increased by four levels.

(PSR ¶¶ 56-62). The Government agrees with that calculation.[4] Probation also, however, applies a two-point offense level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). Based on Franzone's post-plea conduct, however, the Government's view is that the defendant has not appropriately accepted responsibility and the reduction is, therefore, inapplicable. Accordingly, the Government calculates the defendant's offense level as 37.

The defendant has no known prior convictions, and his Criminal History Category is I. (PSR ¶¶ 67-68). Accordingly, his Guidelines range is 210 to 262 months' imprisonment.

Franzone objects to the following components of that Guidelines calculation: (1) the applicable loss amount; (2) the application of the two-point enhancement for ten or more victims and the substantial hardship suffered by one or more victims; (3) the application of a two-point enhancement for the use of sophisticated means in perpetrating the fraud; and (4) the applicability of the two-point reduction for acceptance of responsibility. All of Franzone's arguments are without merit and should be rejected without a hearing.[5]

  B.  **Franzone's Objection to Loss Amount**

Franzone boldly asserts in his sentencing submission that there "was no loss to investors in this case." (Def. Mem. at 20). That is utterly wrong, both as a matter of fact and law.

---

[4] In the *Pimentel* the Government provided to the defendant and the Court on the date of the defendant's plea, the Government gave the defendant the benefit of a two-point reduction in offense level pursuant to U.S.S.G. § 4C1.1(a) for being a "zero point offender." (PSR ¶ 6). Upon further evaluation and subsequent review of the Guidelines, the Government agrees with Probation that the zero point offender reduction does not apply.

[5] In additional to objecting to the Guidelines calculation, Franzone has objected to numerous factual statements in the PSR. The Government respectfully submits that those issues are immaterial, and to the extent those disputes would not alter the Court's sentence, resolving each of Franzone's myriad objections is unwarranted.

### 1. Applicable Law on Loss Amount

The Guidelines provide for an enhancement in fraud cases based on the amount of "loss," which is the greater amount of either the "actual loss" or "intended loss." U.S.S.G. § 2B1.1(b)(1), Notes to Table. "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "intended loss" is the "pecuniary harm that the defendant purposely sought to inflict." *Id*. Reasonably foreseeable pecuniary harm means monetary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*.

The Guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). Thus, in determining the amount of loss involved under U.S.S.G. § 2B1.1(b)(1), a court "'need only make a *reasonable estimate* of the loss' resulting from the defendant's crime." *United States v. Abiodun*, 536 F.3d 162, 167 (2d Cir. 2008) (emphasis in *Abiodun*); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

"[I]n investment fraud cases such as this one, where a defendant fraudulently induces victims to invest, courts have found an appropriate measure of loss to be the amount that the defendant induced the victims to invest, less anything the victims received in return." *United States v. Barbera*, No. 21 Cr. 154 (JGK), 2023 WL 6095026, at *2 (S.D.N.Y. Sept. 18, 2023) (citing *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012), *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009), and *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013)). Such a measure is appropriate where the defendant "obtained [victims'] investments by misrepresenting the fund structure in which they would be investing," and the victims "did not intend to take on the risks and benefits of the market associated with [such an] investment," because the victims' losses are "caused not by the decline in value of [the company's] funds, but by their having invested in the first place." *United States v. Bryson*, 101 F. Supp. 3d 147, 155-56 (D. Conn. 2015) (citing *United States v. Paul*, 634 F.3d 668, 677-78 (2d Cir. 2011), and *Stitsky*, 536 F. App'x at 112).

### 2. Discussion of Loss Amount

As set forth above, loss may be computed as the amount of principal the limited partners invested in the Fund, less any return. A spreadsheet tracking investments into and withdrawals from the Fund maintained by the Fund administrator reveals that prior to declaring bankruptcy, investors had deposited into the Fund a total of approximately $58 million and withdrawn approximately $24 million, for a net deposit of approximately $34 million in principal.[6] (*See* Ex.

---

[6] Contrary to Franzone's assertions (*see* Def. Mem. at 21) the Government's loss calculation is not based solely on the losses of one particular investor (the "Trust"). Rather, it is the case that

D). Thus, the applicable enhancement for loss amount is 22 offense levels, because the loss is more than $25 million and less than $65 million.[7]

Franzone, however, argues that the investors did not incur losses because "the investors are recouping multiple times their investments in the Fund thanks to Franzone's decision, before the Fund went into bankruptcy, to invest $250,000 of the Fund's monies in purchasing shares of CoreWeave." (Def. Mem. at 21). As an initial matter, that is factually wrong. Two investors withdrew from the Fund's bankruptcy proceeding and have not received any distributions of the proceeds of CoreWeave stock. Those investors' principal investments (less withdrawals) total $28,500,000, which still results in a 22-level loss enhancement. (*See* Def. Mem. Ex. F; Ex. D). But even more critically, Franzone's argument completely ignores well-settled law that he cannot benefit from the mere fortuity of his investment in CoreWeave achieving a 30,000% return *five years after* his fraud was discovered and the Fund declared bankruptcy.

The Guidelines are clear that there are only two circumstances in which it is appropriate for a district court to make "credits against loss": (1) where there are funds returned to victims "before the offense was detected," and (2) in certain cases "involving collateral pledged or otherwise provided by the defendant." U.S.S.G. § 2B1.1 Application Note 3(D). Neither of those circumstances applies here. As to the first circumstances, the Fund first invested $250,000 in CoreWeave at the end of February 2019, mere months before Franzone's fraud was discovered and the Fund declared bankruptcy. At the time, CoreWeave's business was focused on mining Ethereum cryptocurrency through a network of server farms. (*See* Ex. T, Bankr. Dkt. 627, at 6; Ex. H-3, Attachment C, *Forbes*, "How CoreWeave's GPU Bet Made Four Risk-Loving Cryptominers AI Billionaires, at 7-9 (Sept. 22, 2025)). It was not until CoreWeave's business pivoted to artificial intelligence in 2022 that its value began to substantially increase. (*See* Ex. T, Bankr. Dkt. 627, at 6; Ex. H-3, Attachment C, at 8-9). Indeed, the first tender offer the CRO received for the Fund's CoreWeave shares, did not occur until October 2023, four years after Franzone's fraud was discovered and the Fund declared bankruptcy, and more than two-and-a-half years after Franzone was indicted in this case. And the first payout to investors in the bankruptcy proceeding only occurred mere months ago in the fall of 2025. As to the second circumstance, it plainly does not apply: this case does not involve a fraudulent loan in which the defendant pledged collateral. Thus, the plain text of the Guidelines does not provide for any reduction in loss amount based on any recovery by investors in the bankruptcy.

---

those losses *alone*—even if there were no others—are sufficient to place the defendant in the range of $25 million to $65 million in losses.

[7] The Guidelines calculation remains the same even if one excludes from the loss calculation the principal deposited by the individuals who provided Franzone with letters stating that they do not view themselves as victims. (*See* Def. Mem., Ex. B). Removing those individuals from the calculation, reduces the loss amount by approximately $6.7 million, which still yields the same range of $25 million to $65 million. (*See* Exs. D, H).

Franzone's position is also contradicted by case law. The Second Circuit has held that a defendant's "arguments that the loss calculation should be offset … by his company's bankruptcy filings are unpersuasive," because the Guidelines only allow for reduction of the loss amount for money returned "before the offense was detected." *United States v. Ware*, 399 F. App'x 659, 662 (2d Cir. 2010); *see also United States v. Bergstein*, 788 F. App'x 742, 747 (2d Cir. 2019) (affirming district court's decision not to reduce the loss amount by the funds subsequently recovered by the company from which the defendant had misappropriated funds). Thus, the law is clear that the loss amount should not be reduced by "funds received in bankruptcy *after* the conspiracy was uncovered, or to the potential value of a future bankruptcy payout." *United States v. Bryson*, 101 F. Supp. 3d 147, 157 (D. Conn. 2015); *see also United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (Mar. 28, 2024) (Tr. at 4-5) ("a thief who takes his loot to Las Vegas and successfully bets the stolen money is not entitled to a discount on the sentence by using his Las Vegas winnings to pay back all or part of what he stole if and when he gets caught").

Franzone additionally argues that he is not responsible for the losses suffered by the Linden West Trust because it was Investor-1, the former Trustee of the Linden West Trust, who made the decision to abandon Linden West's limited partnership interest in the Fund. (Def. Mem. at 22). But this argument is likewise unavailing. Linden West abandoned its limited partnership interest on December 1, 2020 (*see* Def. Mem., Ex. F), more than a year after Franzone's fraud was discovered and the Fund declared bankruptcy, and approximately three years before CoreWeave's first tender offer to the Fund. Thus, at the time that Linden West's abandonment occurred, Franzone could no longer receive a credit against losses for any payments made to Linden West because his fraud had long been detected (*see* U.S.S.G. § 2B1.1, Application Note 3(D)); regardless of what Investor-1 did, he could not have been a superseding cause of the loss because the loss had already been incurred for Guidelines purposes when Franzone's fraud was discovered. Franzone's argument to the contrary is no more than an attempt to improperly deflect the responsibility from himself and cast blame on the now-deceased Trustee of Linden West. Franzone is the one who lied to investors to induce them to invest their money in the Fund. Franzone is, therefore, responsible for the losses, and cannot shift blame based on the Trustee's subsequent actions.

Finally, Franzone argues that there is no loss because Franzone did not intend to cause a loss to anyone. But even assuming that is the case, it is of no legal consequence. The Guidelines provide that loss is the greater amount of either the "actual loss" or "intended loss." U.S.S.G. § 2B1.1(b)(1), Notes to Table. Thus, even if Franzone intended no loss, he is still responsible for the actual loss investors suffered at the time his fraud was discovered, which amounts to approximately $34 million.

Accordingly, the defendant's argument that the loss amount under U.S.S.G. § 2B1.1(b)(1) is "zero" should be rejected, and the Court should find based on the record evidence that the loss amount for purposes of the Guidelines calculation falls within the range of $25 million to $65 million dollars.

### C. Defense Objection to the Number of Victims and Substantial Hardship

The defendant similarly objects to the two-point enhancement for ten or more victims, or at least one victim who suffered substantial hardship. Pursuant to Section B1.1(b)(2) of the Guidelines, a two-level enhancement is warranted if the offense "involved 10 or more victims" or "resulted in substantial financial hardship to one or more victims." U.S.S.G. § 2B1.1(b)(2)(A). The enhancement is clearly applicable in this case, both because the offense involved 10 or more victims and because at least one victim suffered substantial financial hardship. As an initial matter, attached to this submission as exhibit H are victim impact letters covering more than ten victims.[8] Moreover, as set forth above, *supra* at 4-5, Franzone made repeated misrepresentations to investors at large through his website, fund subscription documents including the PPM, and in emails. Similarly, the monthly reports Franzone sent to all investors contained misrepresentations and omissions, *supra* at 6-7. Thus, just because an investor has not submitted a victim impact letter, does not mean that they are not a victim under the Guidelines. FF Fund had over 100 investors, Franzone has submitted letters from approximately 30 of them stating that they do not view themselves as victims; excluding those individuals from the count, that leaves more than 70 victims of Franzone's fraud.

Moreover, the fact that most of the Fund's investors have recovered their investments through the bankruptcy does not alter their status as statutory victims. The Second Circuit has held that "individuals who have been fully reimbursed for their financial losses may be deemed victims for purposes of the sentencing enhancement set forth at U.S.S.G. § 2B1.1(b)(2)." *United States v. Abiodun*, 536 F.3d 162, 168 (2d Cir. 2008). The victim enhancement applies where the victims "suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Id.* 168-69; *see also United States v. Smith*, 751 F.3d 107, 119 (3d Cir. 2014) (joining the Second, Ninth, and Eleventh Circuits in holding that "individuals who expend time, effort, and money before successfully obtaining reimbursement suffer an actual loss and remain victims under § 2B1.1(b)(2)"). In this case, the limited partners were deprived of access to their invested funds from at least September of 2019 until the CRO made the first distribution of proceeds from the sale of CoreWeave stock in late 2025. So for *six years*, the victims could not access their investment and had to spend time and effort to recoup the amount. They are clearly victims under the Guidelines.

---

[8] The victim impact letters collectively cover approximately 24 investors. (*See* Ex. H). The first letter addresses the losses suffered by a victim and her husband; the second similarly addresses the harm suffered by the victim and her husband; and the third addresses the harm suffered by the victim. The fourth letter addresses the harm suffered by the victim and "several" family members who collectively invested over $500,000. The schedule of investors provided by the fund administrator lists four individuals with the same last name as that victim, who together invested approximately $530,000. (*See* Ex. D). The fifth letter explains that the author brought thirteen clients into the Fund as a result of Franzone's misrepresentations. The sixth and seventh letters cover the victims individually. The eight letter is from an individual Franzone victimized after the Fund filed for bankruptcy; the ninth letter is a letter the Government received in support of Franzone that was not included in the defense submission but includes here for completeness.

With respect to substantial hardship, U.S.S.G. § 2B1.1, Application Note 4(F) states that in determining whether the offense resulted in substantial financial hardship to a victim, among the factors a court should consider are whether the victim suffered "a substantial loss of a retirement, education, or other savings or investment fund," made "substantial changes to his or her employment, such as postponing his or her retirement plans," made "substantial changes to his or her living arrangements, such as relocating to a less expensive home," or suffered substantial harm to his or her ability to obtain credit. U.S.S.G. § 2B1.1, Application Note 4(F). "Substantial financial hardship might also be present where the number of victims is high, the amount lost is high, or the victims are particularly vulnerable." *United States v. Cheng*, No. 21-CR-261 (RA), 2025 WL 573767, at *2 (S.D.N.Y. Feb. 21, 2025); *see United States v. Gowing*, 05-CR-782-2 (GBD), 2024 WL 3607112, at *2 (S.D.N.Y. July 30, 2024) (collecting cases).

In this case, one victim ("Victim-1") describes how Franzone held "a very significant amount of" Victim-1's and her husband's life savings, "practically everything [they] had." (*See* Ex. H-1). Victim-1 continues that after she lost her job in 2020, the money Franzone took from Victim-1 and her husband "was what we need to start over and rebuild" and describes the "relentless stress" she suffered trying "rebuild what was stolen." Moreover, in an interview with the Government, Victim-1's husband similarly stated that they invested all their money into Franzone's fund and "could not afford to lose it." The loss of those funds "completely reset" how long Victim-1's husband expected he would have to work. (*See* Ex. U). The loss of savings that Victim-1 and her husband suffered and the need for Victim-1's husband to postpone his retirement meet the substantial financial hardship standard under the Guidelines.

### D. Defense Objection to Sophisticated Means

Pursuant to Section 2B1.1(b)(10)(C) of the Guidelines, a two-level enhancement is warranted if the offense "involved sophisticated means." U.S.S.G. § 2B1.1(b)(10). "Conduct such as hiding assets or transactions, or both, through the use of fictious entities, corporate shells, or offshore financial accounts" can be "sophisticated means," as can an "especially complex or especially intricate offense." U.S.S.G. § 2B1.1, Application Note 9(B). Franzone employed sophisticated means in executing this offense in several ways. As an initial matter, he created a virtual maze of entities and bank accounts utilized by the Fund that made it nearly impossible ascertain the actual financial state of the fund. In his first report to the Bankruptcy Court, the CRO detailed the complex organizational structure employed by the Fund. (*See* Ex. K, Bankr. Dkt. No. 170). The CRO determined that the Fund had ten subsidiaries, including the FF Fund, F5 Business, and F6 subsidiaries in which the Fund's assets and investments were substantially concentrated. (*See* Ex. K, Bankr. Dkt. No. 170, at 4). The remaining subsidiaries were effectively inactive or dormant shell companies that were not used for their stated purpose. (*See* Ex. K, Bankr. Dkt. No. 170, at 5). Just discerning this corporate structure took the CRO considerable time and investigation. (*See* Ex. K, Bankr. Dkt. No. 170, at 5). The Fund's financials were even more elaborate. Through his investigation, the CRO identified 81 separate bank or brokerage accounts employed by the Fund and associated entities, including 31 accounts at one particular bank. (*See* Ex. K, Bankr. Dkt. No. 170, at 7). In total, the CRO expected that a reconstruction of the Fund's

Case 1:21-cr-00446-VSB    Document 197    Filed 01/15/26    Page 15 of 18

Page 15

finances would require analysis of 67 bank accounts for fifteen different entities. (*See* Ex. K, Bankr. Dkt. No. 170, at 11). Thus, the Fund and financial structure Franzone used to perpetrate and conceal his fraud was extraordinarily sophisticated. *See United States v. Bailey*, 820 F. App'x 57, 62 (2d Cir. 2020) ("Each step in a scheme need not be elaborate if the total scheme was sophisticated in the way all the steps were linked together.").

*Second*, Franzone further concealed his fraud by distributing monthly investor statements that obfuscated the types of assets into which Franzone had placed investor funds and falsely reported consistently positive returns. The generation of these statements, as well as Franzone's fraudulent inflation of the value of the underlying assets such that the returns in these reports were consistently positive constitute sophisticated conduct that warrants application of the enhancement. *See, e.g.*, *United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) (sophisticated means enhancement appropriate in a Ponzi scheme involving the creation of fraudulent loan documents, reporting of fake earnings, and altering account earnings that lasted for three years).

Accordingly, the two-point enhancement for the use of sophisticated means is applicable.

### E. Government Objection to Acceptance of Responsibility

In his objections to the PSR and his sentencing submission, Franzone repeatedly minimizes the scope of his conduct—asserting that he made only limited misrepresentations to only a small number of investors—attempts to deflect responsibility, and engages in victim-blaming. (*See e.g.*, Def. Mem. at 24, 25, 29, 40). In such circumstances, Courts have denied defendants a reduction for acceptance of responsibility under the Guidelines.

The law is clear that "[a] defendant who enters a guilty plea is not automatically entitled to an adjustment for acceptance of responsibility." *United States v. Ortiz*, 218 F.3d 107, 108 (2d Cir. 2000) (citing U.S.S.G. § 3E1.1, Application Note 3). Rather, while acceptance of responsibility cannot be conditioned on a defendant's admission of "any offense *other* than the offense that is the subject of the plea[,] . . . as to the offense that is the subject of the plea, the district court may require a candid and full unraveling." *United States v. Reyes*, 9 F.3d 275, 279 (2d Cir. 1993) (emphasis in original) (affirming denial of acceptance-of-responsibility reduction where "the conduct [the defendant] admitted . . . was both legally and factually sufficient to establish the offense of conviction" but, by denying certain facts beyond his allocution, the defendant did not "accept[] responsibility for the full scope of the offense"). When a defendant continues to deny the full scope of his responsibility, courts can and should deny the defendant credit for acceptance of responsibility. *See United States v. Jones*, No. 23-6113, 2024 WL 3371191, at *2 (2d Cir. July 11, 2024) (ruling that a reduction for acceptance of responsibility was "unwarranted" where defendant merely "accept[ed] responsibility for conduct that satisfie[d] the bare essentials of the offense of conviction" and his explanation was "inconsistent with the extent and scope of the [crime] found by the district court"); *United States v. Ramirez*, 910 F.2d 1069, 1071 (2d Cir. 1990) (affirming denial of acceptance-of-responsibility reduction where the defendant "did not accept responsibility

for the full scope of his charged offense" because he "admitted only to a $120 drug deal" despite "evidence of the over $100,000 found in [his] house").

Here, Franzone has done just that. Despite overwhelming evidence to the contrary—including his own allocution—he has attempted through his objections to the PSR and sentencing memorandum to assert that the scope of his offense was making merely a limited number of misstatements to a limited number of investors. (Def. Mem. at 25). Not so. Moreover, Franzone's attempts to blame others—including deceased Investor-1—show a lack of willingness to accept responsibility—let alone remorse or sympathy—for the consequences of his actions. Moreover, in the bankruptcy action Franzone has made every attempt to stand in the way of distributions being made to victims, repeatedly filing objections to the proposed liquidation and distribution of CoreWeave Stock. As two victims stated in their impact letters, "the truth is that CoreWeave succeeded despite him, not because of him," and "he has continued to impact us by filing frivolous motions and appeals in FF Fund I's bankruptcy case." (*See* Exs. H-1, H-7). Those are not the actions of someone who has accepted responsibility for what they have done and seeks to make amends.

## V. FORFEITURE

Franzone's sentencing submission requests a forfeiture hearing. (*See* Def. Mem. at 50). Assessing forfeiture in this case, however, is a straightforward application of the law, and no hearing is necessary.

### 1. Applicable Forfeiture Law

As the Court is aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic power of criminal enterprises." *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017) (citation and internal quotation marks omitted).

Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). Forfeiture in fraud cases is mandatory. *See United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012); 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case."). The court's determination "may be based on evidence already in the record." Fed. R. Crim. P. 32.2(b)(1)(B). The "calculation of forfeiture amounts is not an exact science. '[T]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). A court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48. As "an aspect of sentencing,"

*Libretti v. United* States, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). The purpose of forfeiture is "punitive rather than restitutive." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). Absent Eighth Amendment concerns, the defendant's ability to pay a money judgment is irrelevant. *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010).

The forfeiture statute at issue here, 18 U.S.C. § 981(a)(1)(C), provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting 'specified unlawful activity'" as defined in section 1956(c)(7) of Title 19 is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C). Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity" includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title, which includes wire and securities fraud." *See* 18 U.S.C. § 1961(1) (listing as "racketeering activity" which wire fraud and securities fraud). Where a crime involves "illegal goods, illegal services, [and] unlawful activities," 18 U.S.C. § 981(a)(2), the Court must forfeit the gross proceeds of the offense.

Courts have found that fraud and Ponzi schemes are inherently unlawful, such that forfeiture extends to "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). *See United States v. Kahale*, 2010 WL 3851987, at *32 (E.D.N.Y. Sept. 27, 2010), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012); *United States v. Milton*, 2024 WL 779210, at *3 (S.D.N.Y. Feb. 26, 2024) (citations omitted) (selling securities based on artificially inflated valuations is inherently unlawful). In other words, "[p]roceeds" are "property that a person would not have [obtained] but for the criminal offense." *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012) (quoting *United States v. Grant*, No. 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)).

Proceeds of a crime "need not be personally or directly in the possession of the defendant…in order to be subject to forfeiture," but rather "must have, at some point, been under the defendant's control…in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012). Temporary control is sufficient, and the defendant need not retain the proceeds. *See United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019); *Rajaratnam v. United States*, 736 Fed. Appx. 279, 284 (2d Cir. 2018) (summary order) (even if proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, "he nonetheless had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point.'") (quoting *Contorinis*, 692 F.3d at 147); *United States v. Ohle*, 441 Fed. Appx. 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "whether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting

forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party.").

*2. Discussion*

Pursuant to the legal principles above, this Court ought to impose a forfeiture money judgment totaling $46,643,293.18. This figure represents a "reasonable estimate" of the proceeds of Franzone's crime, predicated on the value of all funds invested in FF Fund (that is, deposited with the Fund), but conservatively excluding money invested by those who submitted letters on Franzone's behalf. (*See* Ex. D, Spreadsheet of Investments). The Court need not hold a hearing to reach this conclusion. Given the record evidence set forth above, it is "reasonable" for this Court to presume that such funds constitute proceeds of the offense.

## VI. CONCLUSION

For the reasons discussed above, the Government respectfully requests that the Court enter an order based on the evidence before the Court finding that the defendant's calculated offense level is 37 and criminal history category is I, with a corresponding Guidelines range of is 210 to 262 months' imprisonment, and that the forfeiture amount is $46,643,293.18.

Respectfully submitted,

JAY CLAYTON
United States Attorney

/s/
Marguerite B. Colson
Maggie Lynaugh
Sarah Mortazavi
Assistant United States Attorneys
(212) 637-2587/2448/2520